CATHERINE FAITH KAPPENBERG, f.k.a. CATHERINE FAITH ABRASH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kappenberg v. Commissioner
Docket No. 14202-90
United States Tax Court
T.C. Memo 1994-292; 1994 Tax Ct. Memo LEXIS 295; 67 T.C.M. (CCH) 3132; T.C.M. (RIA) 94292; June 27, 1994, Filed *295 An appropriate order will be issued, and decision will be entered under Rule 155. For petitioner: Roger L. Simon. For respondent: Catherine R. Chastanet. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined, by statutory notice dated April 13, 1990, deficiencies in and additions to the Federal income tax of petitioner and Bruce Abrash as follows: Additions to Tax Year
Deficiency
Sec. 6659
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 106,730
$ 32,019
$ 5,336.50
[1]
1982
10,585
3,175
529.25
[1]
Respondent also determined, if petitioner and Mr. Abrash are not liable for a valuation overstatement addition to tax under section 6659, [1] that they are liable for an addition to tax for substantial understatement of tax under section 6661. Respondent further determined that petitioner and Mr. Abrash are liable for additional interest under section 6621(c). *296 After concessions, [2] the sole issue remaining for decision is whether, under section 6013(e), petitioner is entitled to relief from joint and several liability for the deficiencies. For the reasons that follow, we hold that petitioner is not entitled to such relief for 1981, but that she is so entitled for 1982. FINDINGS OF FACT Petitioner resided in Westbury, New York, when she filed the petition in this case. Petitioner married Bruce Abrash in 1973, and she was married to him *297 in 1981 and 1982, the years at issue. Mr. Abrash had four children from a prior marriage, two of whom lived with petitioner and Mr. Abrash during the years at issue. Petitioner and Mr. Abrash were divorced in early 1990. The last 10 to 12 years of the marital relationship were extremely tumultuous because of Mr. Abrash's mood swings, which were aggravated by his use of alcohol and prescription drugs. Petitioner and Mr. Abrash were separated for more than 1 month at least four times between January 1977 and January 1983, including January-October 1981. After 1982, petitioner and Mr. Abrash were separated at least six more times, the last time from April 1987 through their divorce in 1990. Petitioner is an intelligent and well-educated person. Petitioner has extensive post-secondary-school education and experience in the field of social work. In June 1970, petitioner received a master's degree in social work from the Adelphi University School of Social Work, and in 1979, she was a doctoral candidate in social welfare at the Hunter School of Social Work, City University of New York. However, problems at home caused petitioner to postpone her studies, and at the time of trial, *298 she was still working on the final requirements for her doctorate. From 1970 through 1979, petitioner was employed as a social worker by various employers in Nassau County, New York. Petitioner's duties for these employers included family counseling and mental status evaluations. From 1979 through 1981, petitioner was an assistant professor of social work at Molloy College. Mr. Abrash is an expert and dealer in rare coins. Mr. Abrash was a partner in The Old Roman, a rare coin dealership, prior to and during the first years of his marriage to petitioner. In the mid-1970s, Mr. Abrash and his partner in The Old Roman formed a new firm, Numismatic Funding. However, in 1975, Mr. Abrash, petitioner, and Kenneth Lee purchased that partner's interest in Numismatic Funding. Petitioner paid approximately $ 30,000 for her one-seventh interest in Numismatic Funding. After petitioner purchased her interest in Numismatic Funding, she worked part time as an assistant office manager for the firm. Petitioner's responsibilities at Numismatic Funding included office space management, telephone operations, and travel arrangements for Mr. Abrash's trips to various coin shows. Petitioner did *299 not open the company's mail or participate in the business decisions of Numismatic Funding, and Mr. Abrash or Carol Thompson, Numismatic Funding's head bookkeeper, took care of the firm's financial matters and books. Petitioner nevertheless knew that Numismatic Funding was extremely successful during the early 1980s, having an annual sales volume of $ 6 to $ 14 million during 1980-86. Petitioner continued to work at Numismatic Funding even after she separated from Mr. Abrash in January 1981. However, as a result of that separation, Mr. Abrash narrowed petitioner's duties at Numismatic Funding, canceled her firm charge cards, and eliminated her access to firm files. Because of the cutbacks in responsibilities and limitations on her access to firm files, petitioner reduced the time she spent at Numismatic Funding to about 4 hours a week. Following petitioner's reconciliation with Mr. Abrash in October 1981, her work schedule at Numismatic Funding increased to approximately 8 hours per week in late 1981 and 17 hours per week in 1982. By 1982, petitioner had resumed most of her prior responsibilities at Numismatic Funding, and Mr. Abrash had reinstated her access to firm files. *300 Petitioner never received any distribution, except salary, from Numismatic Funding. Petitioner and Mr. Abrash had both individual and joint bank accounts during their marriage. In 1981, petitioner's Dreyfus Liquid Assets account had a balance of about $ 97,000. While petitioner and Mr. Abrash each maintained their own individual bank accounts, making their own deposits, writing their own checks, and reconciling the respective bank statements, they shared these duties with respect to their joint bank accounts. Petitioner opened and read mail sent to the family's residence that concerned the family's finances, and petitioner paid the family mortgage and other household expenses using money that Mr. Abrash would give her. Goldmar, Ltd., Mining Program
During the years at issue, petitioner and Mr. Abrash made investment decisions separately from one another. Mr. Abrash did not discuss his investment decisions with petitioner. From 1976 to 1981, Mr. Abrash personally invested over $ 500,000 in various ventures. On September 1, 1981, Mr. Abrash purchased four units of "participation" in the 1981 Goldmar, Ltd., mining program. In consideration therefor, Mr. Abrash delivered *301 to Goldmar, Ltd., two $ 40,000 promissory notes payable on September 1, 1982 and 1983, respectively. Mr. Abrash also signed a letter agreement authorizing James Wolff, the Goldmar, Ltd., operating agent, to borrow $ 480,000 on behalf of Mr. Abrash from Sterling Finance, Ltd., for use by the 1981 Goldmar, Ltd., program. Mr. Abrash's participation in the Goldmar, Ltd., program would automatically extend from year to year for the succeeding 19 years for a predetermined annual payment, unless terminated sooner. Prior to November 10, 1982, Mr. Abrash canceled his participation in the 1982 Goldmar, Ltd., mining program. Mr. Abrash, however, retained his vested equity interest in the 1981 Goldmar, Ltd., program. On November 22, 1982, Goldmar, Ltd., sent Mr. Abrash written confirmation of cancellation of his participation in the 1982 Goldmar, Ltd., program. Mr. Abrash never discussed his Goldmar, Ltd., investment with petitioner. Mr. Abrash also requested that Goldmar, Ltd., send all correspondence to him at Numismatic Funding, where petitioner did not have access to his mail. However, in spring 1983, petitioner overheard Mr. Abrash complaining to their partner, Mr. Lee, and Leslie *302 Hare, Mr. Abrash's accountant, about his investment in Goldmar, Ltd., but she did not hear why he was complaining about it. Petitioner's and Mr. Abrash's Lifestyle
During 1981, petitioner resided in the family's Long Island house. In June 1981, petitioner purchased a Florida condominium, with the intent of using it a vacation home; [3] the cost of the condominium was $ 93,000, composed of a $ 19,000 downpayment and a $ 74,000 mortgage loan, and petitioner spent an additional $ 5,000 or $ 6,000 on furnishings. Petitioner did not make any other large expenditures during 1981, and, except for a few trips to Florida and one trip to Japan to attend a wedding, petitioner did not take any vacations during 1981 or 1982. In 1981, as in previous years, petitioner drove an automobile owned by Numismatic Funding. During the January-October 1981 separation, Mr. Abrash resided in the Island Inn Hotel, one of the more palatial and expensive *303 hotels in Nassau County, New York. During 1981, Mr. Abrash purchased, among other things, jewelry for Numismatic Funding sales personnel, a car for his father, and expensive gifts, including lavish dinners, for friends. Mr. Abrash took his brother to London on the Concorde, made cash gifts to his brother's finance, and helped his brother and sister-in-law pay for their wedding. In or around July 1981, Mr. Abrash purchased a condominium in Bay Shore, New York, for $ 135,700. Although Mr. Abrash refused to discuss his personal finances with petitioner, and she did not know how much he paid for the Bay Shore condominium, he did brag to her about the condominium and the custom furnishings that he had purchased to decorate it. While Mr. Abrash was always a free spender, petitioner was troubled by his unpredictable behavior during 1981, particularly his reluctance to discuss his personal affairs and spending habits with her. During the separation, petitioner hired a private investigator to look into Mr. Abrash's personal affairs and spending habits. However, petitioner terminated the investigation after 1 week because she lacked the funds to pay for its continuation. In May 1982, *304 after petitioner and Mr. Abrash had reconciled, they purchased a new house for $ 240,000, funded by a $ 60,000 downpayment and a $ 180,000 mortgage loan. Petitioner and Mr. Abrash spent an additional $ 75,000, of which $ 25,000 was proceeds of a home improvement loan, to renovate their new house. Petitioner and Mr. Abrash also purchased a Shelter Island cooperative apartment in October 1982. Petitioner and Mr. Abrash paid $ 61,000 for the Shelter Island cooperative, approximately two-thirds of which they obtained through third-party financing. In 1983, petitioner and Mr. Abrash purchased a second Shelter Island cooperative apartment for $ 103,000, composed of a $ 25,000 downpayment and a $ 78,000 mortgage. From 1980 to 1983, Mr. Abrash spent about $ 25,000 on gifts to petitioner. Petitioner and Mr. Abrash experienced severe financial troubles during the mid and late 1980s. Business losses and a Federal Trade Commission investigation led to the closing of Numismatic Funding in 1987. As a result of the closing of Numismatic Funding, petitioner could not afford to maintain the Florida condominium, and she put it up for sale in 1988. Petitioner and Mr. Abrash had previously sold *305 one of their two Shelter Island cooperatives for either $ 125,000 or $ 140,000. Sometime in 1989, petitioner sold her Florida condominium, receiving net proceeds of $ 103,000. In 1989 or 1990, the family residence and the second Shelter Island cooperative apartment were sold through foreclosure sales that did not completely satisfy petitioner's obligations to her creditors. During 1989, petitioner had wage income of $ 37,368 and interest income of $ 301.02. Petitioner did not have any other income for 1989. The 1981 and 1982 Joint Income Tax Returns
Petitioner and Mr. Abrash reported, on their 1981 Federal income tax return, gross income of $ 342,358, composed of salary and wages of $ 284,010, interest and dividends of $ 11,608, State and local income tax refunds of $ 43,399, and other income of $ 3,341. Petitioner and Mr. Abrash reported losses of $ 243,870, composed of a $ 207,400 Schedule C loss on his investment in Goldmar, Ltd., and a $ 36,470 Schedule E loss. As a result of these losses, petitioner and Mr. Abrash received a $ 24,477 refund of taxes paid. Petitioner and Mr. Abrash reported, on their 1982 Federal income tax return, gross income of $ 359,967, composed *306 of salary and wages of $ 336,477, interest and dividends of $ 12,545, State and local income tax refunds of $ 10,520, and other income of $ 425. Petitioner and Mr. Abrash reported losses of $ 170,656, composed of a $ 21,157 Schedule C loss on his investment in Goldmar, Ltd., a $ 26,005 Form 4797 loss, and a $ 123,494 Schedule E loss. Petitioner and Mr. Abrash's 1981 and 1982 joint income tax returns were prepared by the accounting firm of Hare & Karpman, in which Mr. Abrash's accountant, Leslie Hare, was a partner. Petitioner and Mr. Abrash signed their 1981 income tax return in May 1982 and their 1982 income tax return in August 1983. OPINION Before we reach the substantive issue of whether petitioner is an "innocent spouse" under section 6013(e), we must address the evidentiary issue arising from the evasive answers given by petitioner and her counsel to the interrogatories served by respondent during pretrial discovery. I. Evidentiary Issue
Respondent, at trial and on brief, moved that petitioner's testimony on "the date, time spent, place, individuals present, procedures used, discussions had, questions asked, and reviews undertaken in the signing of her 1981 and *307 1982 income tax returns" be stricken from the record in this case. [4] Respondent objects to the admissibility of this testimony on the ground that petitioner failed to obey this Court's order to provide full and complete answers to respondent's interrogatories on these issues. Respondent argues that petitioner's refusal to provide full and complete answers to these interrogatories deprived respondent of the ability to prepare her case on these issues. Respondent argues that she therefore would be unfairly prejudiced if the Court did not strike petitioner's testimony on these issues. Petitioner contends that her testimony concerning the date, time spent, place, individuals present, and reviews undertaken with respect to her 1981 and 1982 income tax returns should be allowed to stand. *308 Petitioner argues that she provided respondent with full and complete answers to all interrogatories, and that her testimony is consistent with those answers. Petitioner further argues that even if her testimony were inconsistent with her answers to the interrogatories, the inconsistencies should affect the credibility of her testimony, not its admissibility. On September 14, 1992, respondent served interrogatories on petitioner pursuant to the provisions of Rule 71. Question 14 of the interrogatories asks -- When the petitioner signed the tax returns for the 1981 and 1982 tax years: a) how much time did petitioner spend in reading each; b) were any other individuals present with petitioner while she reviewed each return, if so, list said individuals by name and current phone number; c) did petitioner question any portion of each return, and if so, what did she question and who did she question; d) did petitioner and Bruce Abrash sign each return simultaneously?
On September 22, 1992, petitioner served respondent with her answers to the interrogatories. Petitioner stated that the exact duration of time spent reading each was unknown, and that she had no recollection *309 of (1) whether any other individuals were present when she reviewed the returns, (2) whether she questioned any portion of either return, and (3) whether she and Mr. Abrash signed the returns simultaneously. Petitioner also stated that it was improper for respondent to ask who was present when she reviewed the returns. On October 23, 1992, respondent filed a motion to compel responses to the interrogatories, on the grounds that many of petitioner's answers, including petitioner's response to interrogatory 14, were either incomplete or nonresponsive. On October 27, 1992, we granted respondent's motion and ordered that petitioner "on or before November 17, 1992, serve upon counsel for respondent full, complete and responsive answers made under oath and in good faith, to interrogatories No. 12, 14, 16, 19, 20, 21, 22, 23, 24, 25, 26, 27, 29, 34, 35, and 44". (Emphasis added.) On November, 13, 1992, petitioner served "new" answers to the interrogatories on respondent. Petitioner's second answer to interrogatory 14 was substantially the same as her first response. [5]
*310 Petitioner, on direct examination, testified that she and Mr. Abrash met with his accountant, Leslie Hare, prior to executing the 1981 and 1982 joint returns. Petitioner testified that Mr. Hare reviewed the completed returns for petitioner during these meetings, explaining each item of significance to her. Petitioner further testified that Mr. Hare told her that the $ 207,400 loss reported on the 1981 income tax return was related to a limited partnership interest of Mr. Abrash, and that "everything was in order." Petitioner incorrectly argues that her testimony about her discussions with Mr. Hare are in accord with her answer to interrogatory 14. Petitioner argues that respondent's interrogatories were poorly drafted and that petitioner did not have a "duty to read into and guess at what * * * [respondent was] asking". Petitioner argues, for example, that part b of interrogatory 14 erroneously assumes that petitioner reviewed the tax returns when, according to her testimony, Mr. Hare reviewed them for her and explained them to her, and that because "simultaneously" means "at the same time", her answer to part d of interrogatory 14 would have been no if she had known that she *311 had signed the returns 5 minutes before or after Mr. Abrash. Such casuistical interpretations of interrogatory 14 are evasive and inconsistent with the purposes to be served by interrogatories. See 8 Wright & Miller, Federal Practice and Procedure, sec. 2001, at 18-19 (discovery procedures, including interrogatories, intended to help the parties prepare for trial, eliminate surprise, and put an end to the "'sporting theory of justice,' by which the result depends on * * * the skill and strategy of counsel."), sec. 2162, at 484-485 (1970). Petitioner's answer to interrogatory 14 served only to deceive respondent and impede her preparation for trial. Accordingly, we will strike from the record petitioner's testimony about her alleged discussions with Mr. Hare. See Rule 104(c). Even if we had not stricken petitioner's testimony about the discussions she had with Mr. Hare, we would have given it no weight. Petitioner, in response to respondent's interrogatory 14, stated that she could not recall if she had made any inquiries concerning any portion of the income tax returns at issue, and if she had made such inquiry, to whom she had addressed her questions. Petitioner also indicated *312 that she did not independently review her tax returns. Petitioner nevertheless testified that Mr. Hare discussed the tax returns with her, telling her that the losses claimed with respect to Goldmar, Ltd., were legitimate deductions. In light of this apparent inconsistency between petitioner's testimony and her answers to respondent's interrogatory 14, coupled with the usual concerns about unsupported self-serving testimony, Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir. 1976), we think it was incumbent on petitioner to provide credible evidence to corroborate her testimony, Monahan v. Commissioner, T.C. Memo. 1994-201 (citing Wichita Terminal Elevator Co. v. Commissioner, 162 F.2d 513 (10th Cir. 1947), affg. 6 T.C. 1158 (1946)). Petitioner did not offer the testimony of Mr. Hare or Mr. Abrash to corroborate her testimony about her alleged discussions with Mr. Hare. Petitioner failed to provide any other evidence that would corroborate her testimony. Thus, even if we had considered petitioner's testimony about her discussions with Mr. Hare, it *313 would have been insufficient to persuade us that she (1) reviewed the tax returns at issue, (2) discussed these returns with Mr. Hare, or (3) made any inquiries of Mr. Hare or Mr. Abrash concerning any portion of the returns. Cf. Monahan v. Commissioner, supra.
II. Innocent Spouse
Section 6013(a) provides that spouses may file a joint Federal income tax return. If a husband and wife file a joint return, the tax is computed on their aggregate income, and the liability with respect to the tax is joint and several. Sec. 6013(d)(3). However, a spouse is relieved of this joint and several liability for tax if he or she shows that: (1) A joint Federal income tax return was filed for the year in issue; (2) there was a substantial understatement of tax on that return attributable to grossly erroneous items of the other spouse; [6] (3) in signing the income tax return, he or she did not know or have reason to know of the substantial understatement; and (4) it is inequitable to hold him or her liable for the deficiency. Sec. 6013(e); Hayman v. Commissioner, 992 F.2d 1256, 1260 (2d Cir. 1993), affg. T.C. Memo. 1992-228; *314 Silverman v. Commissioner, T.C. Memo. 1994-153. If the substantial understatement of tax is due to a claim of deduction, the spouse also must show that the understatement exceeds a specified percentage of that spouse's adjusted gross income for the most recent year ending before the date the deficiency notice was mailed. Sec. 6013(e)(4); Purcell v. Commissioner, 86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987); Park v. Commissioner, T.C. Memo. 1993-252. Failure to satisfy any one of these requirements will prevent the spouse from qualifying for "innocent spouse" relief. Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Grubich v. Commissioner, T.C. Memo. 1993-194. *315 Petitioner and Mr. Abrash filed joint income tax returns for 1981 and 1982. The parties agree that the tax stated on those returns were substantially understated, and that those understatements were attributable to a grossly erroneous item of Mr. Abrash. It also is evident that the understatements of tax are in excess of 25 percent of petitioner's 1989 adjusted gross income, the preadjustment year. Remaining in dispute is whether petitioner, in signing the income tax return, knew or had reason to know of the substantial understatements of tax, and whether it would be inequitable to hold petitioner liable for the deficiencies in question. A. Knowledge
When petitioner signed her and Mr. Abrash's 1981 and 1982 joint income tax returns, she did not know that the deductions claimed with respect to his Goldmar, Ltd., investment were erroneous. Petitioner therefore did not have actual knowledge of the substantial understatements of tax on her and Mr. Abrash's joint income tax returns. Thus, our attention shifts to whether petitioner had reason to know of the substantial understatements in tax. A taxpayer generally has "reason to know" of a substantial understatement of tax *316 if he or she would have reason to know of the transaction that gave rise to the substantial understatement. Purcell v. Commissioner, 826 F.2d 470, 474 (6th Cir. 1987) affg. 86 T.C. 228 (1986); see also Smith v. Commissioner, 70 T.C. 651, 673 (1978); Mayworm v. Commissioner, T.C. Memo. 1987-536. We hold spouses to this standard, irrespective of whether the substantial understatement is due to an omission of income or to a claim of deduction. Bokum v. Commissioner, 94 T.C. 126 (1990), affd. on other grounds 992 F.2d 1132 (11th Cir. 1993). However, the Court of Appeals for the Second Circuit, to which this case is appealable, has adopted a somewhat more permissive standard in deduction cases, requiring the relief-seeking spouse to show that he or she did not have reason to know that the deduction would give rise to a substantial understatement. [7]Hayman v. Commissioner, supra at 1261. Because petitioner's case is appealable to the Court of Appeals for the Second Circuit, *317 we will follow a decision of that court, which is on point, in deciding the case at hand. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The relief-seeking spouse has reason to know of a substantial understatement of tax if, at the time the tax return was signed, a reasonably prudent taxpayer in his or her position would have known that the stated tax liability was erroneous or that further investigation was warranted. Hayman v. Commissioner, supra at 1261; Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989), *318 revg. an Oral Opinion of this Court; Stevens v. Commissioner, supra at 1505. The relief-seeking spouse cannot turn a blind eye to facts within his or her reach that would have put a reasonably prudent taxpayer on notice to inquire further. McCoy v. Commissioner, 57 T.C. 732, 734 (1972); see also Stevens v. Commissioner, supra at 1507; Adams v. Commissioner, 60 T.C. 300, 303 (1973). Thus, the relief-seeking spouse is not entitled to "innocent spouse" relief unless she can show that she inquired about and laid to rest any doubts a reasonably prudent taxpayer in her position would have had about the accuracy of the joint returns. Langberg v. Commissioner, T.C. Memo. 1994-223; see also Stevens v. Commissioner, supra at 1507; Levin v. Commissioner, T.C. Memo. 1987-67. Factors relevant to whether the relief-seeking spouse would have had reason to know of the substantial understatement of tax include: (1) The spouse's level of education, (2) his or her involvement *319 in the financial and business affairs of the family, (3) a large unexplained increase in the family's standard of living, and (4) the culpable spouse's evasiveness and deceit about the family's finances. Hayman v. Commissioner, supra at 1261; Bokum v. Commissioner, supra at 148. No single factor or set of factors is dispositive, and we do not make our determination by counting the factors favoring the parties' respective positions. Silverman v. Commissioner, T.C. Memo. 1994-153; see also Guth v. Commissioner, 897 F.2d 441, 444 (9th Cir. 1990), affg. T.C. Memo. 1987-522. Rather, the issue is a factual question to be determined after a review of the entire record. Guth v. Commissioner, supra at 443-444; Park v. Commissioner, T.C. Memo. 1993-252. 1. 1981
Petitioner has not taken any accounting or business courses. However, she is a well-educated and intelligent person who maintained her own bank accounts and made her own investment decisions during the *320 years at issue. While petitioner had knowledge of Numismatic Funding's annual sales volume and profitability, she did not participate in its managerial or financial decisions. Nor did petitioner review Numismatic Funding's books or financial statements even when she had unrestricted access to its files. Petitioner was familiar with the family finances. Petitioner paid the household expenses, including the mortgage payments, and shared the responsibilities of writing checks on and reconciling the bank statements of joint accounts held by her and Mr. Abrash. Petitioner opened and read the mail sent to the family's house that concerned the family's financial affairs, and although separated from Mr. Abrash for most of 1981, she knew that he was maintaining an opulent lifestyle. For example, petitioner knew that Mr. Abrash was living in one of the most palatial and expensive hotels in Nassau County, and that he had purchased a new condominium and its furnishings during 1981. Moreover, Mr. Abrash's unusual reluctance to discuss his personal affairs, including his "excessive" spending, created enough suspicion in petitioner's mind that she hired a private investigator to look into *321 these matters. A cursory examination of petitioner and Mr. Abrash's 1981 Federal income tax returns discloses that they had gross income of $ 342,358 and reported a $ 207,400 loss from Mr. Abrash's investment in Goldmar, Ltd. Mr. Abrash's reported loss therefore reduced petitioner's and his gross income by more than 60 percent, and, when coupled with a Schedule E loss of $ 36,470, resulted in a tax refund of $ 24,477. A deduction of this magnitude would have caused a reasonably prudent taxpayer in petitioner's position to have doubts about the accuracy of the return. Hayman v. Commissioner, 992 F.2d at 1262 ("Tax returns setting forth large deductions, such as tax shelter losses offsetting income from other sources and substantially reducing or eliminating the couple's tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability."); Langberg v. Commissioner, T.C. Memo. 1994-223; Park v. Commissioner, supra; see also Stevens v. Commissioner, 872 F.2d at 1507. The doubtful accuracy of the return, coupled with Mr. *322 Abrash's deliberate evasiveness and extravagant spending habits for 1981, clearly put petitioner on notice that she should inquire further. Cf. Hayman v. Commissioner, supra at 1262; Langberg v. Commissioner, supra; Park v. Commissioner, supra.
We do not deny petitioner "innocent spouse" relief merely because she had notice of unusual facts and circumstances that gave rise to a duty of inquiry. Petitioner could have eliminated any reason she had to know of the substantial understatement of tax had she taken reasonable steps to investigate and put to rest any doubts about the accuracy of the 1981 joint tax return. Cf. Price v. Commissioner, 887 F.2d at 966; Estate of Killian v. Commissioner, T.C. Memo. 1987-365. However, the facts in this case do not show that petitioner took reasonable steps to determine the accuracy of the 1981 joint income tax return. The record in this case lacks credible evidence that petitioner questioned Mr. Abrash or Mr. Hare about the Goldmar, Ltd., loss for 1981 or the deduction related *323 thereto. [8] See supra pp. 11-16. Nor is there any evidence that petitioner made any independent inquiries into the Goldmar, Ltd., investment or the propriety of the claimed deduction for 1981. We therefore conclude that petitioner did not put to rest the doubts that a reasonably prudent taxpayer, in her position, would have had about the accuracy of the 1981 joint income tax return. Accordingly, petitioner has not shown that she did not have reason to know of the 1981 substantial understatement of tax within the meaning of section 6013(e)(1)(C). Petitioner thus cannot satisfy each requirement of section 6013(e) for 1981, and she therefore does not qualify for "innocent spouse" relief for that year. 2. 1982
Notwithstanding the above, petitioner did not have reason to know of the substantial understatement *324 of tax on the 1982 joint income tax return. Although the 1982 understatement of tax arises from a deduction related to the same tax shelter that created the 1981 substantial understatement, petitioner's constructive knowledge of the 1981 understatement, standing alone, does not establish a duty to inquire about the validity of the 1982 deduction. This is because imputed doubts about the accuracy of a large deduction in one year do not carry over to a lesser deduction from the same source in the next year. Cf. Jenny v. Commissioner, T.C. Memo. 1983-1 (Court held evidence insufficient to show wife knew a disputed charitable deduction was improper, even though she knew her husband's return for the prior year was not acceptable). The losses petitioner and Mr. Abrash claimed on their 1982 income tax return with respect to his investment in Goldmar, Ltd., were insufficient to put petitioner on notice that there might be an understatement of tax. Petitioner and Mr. Abrash reported a 1982 loss of $ 21,157 on Mr. Abrash's Goldmar, Ltd., investment. This loss did not have any substantial effect in reducing the tax liability on their reported 1982 gross *325 income of $ 359,967. Cf. Hayman v. Commissioner, supra at 1262; Langberg v. Commissioner, supra.
Respondent incorrectly argues that petitioner and Mr. Abrash's 1982 expenditures were so unusual as to put her on notice of the substantial understatement of tax. Although petitioner and Mr. Abrash purchased a new house and two investment properties during 1982, a large percentage of each purchase price was obtained through third-party financing. Petitioner and Mr. Abrash also sold their former house, providing them with substantial capital to reinvest in these properties. In view of the substantial gross income reported by petitioner and Mr. Abrash for 1981 and 1982 and their third-party financing of their real property investments, these investments were not particularly extravagant. The record further indicates that in 1982 Mr. Abrash did not make unusual and "excessive" expenditures, as he had in 1981, and that he was not evasive about discussing his spending in 1982. Although petitioner heard Mr. Abrash, during spring 1983, complain to Messrs. Lee and Hare about his investment in Goldmar, Ltd., we place little *326 to no significance on these remarks. Even though petitioner had heard Mr. Abrash make his remarks before she signed the income tax return in August 1983, a reasonably prudent taxpayer in petitioner's position might well have assumed that Mr. Abrash's dissatisfaction resulted from his failure to profit from the investment. Knowledge of the investment, standing alone, is not sufficient to create a duty of inquiry, see Hayman v. Commissioner, 992 F.2d at 1261, and the mere fact that Mr. Abrash's Goldmar, Ltd., investment might have soured does not result in a duty to inquire about its effect on the 1982 return. Thus, on the record before us, petitioner did not have a reason to doubt the accuracy of the 1982 income tax return. The fact that petitioner has not established that she inquired about the Goldmar, Ltd., deduction is therefore immaterial. See Robertson v. Commissioner, T.C. Memo. 1992-32. Accordingly, petitioner did not have reason to know of the 1982 understatement of tax. B. The Equities
Petitioner, having established that she did not have reason to know of the 1982 understatement of tax, also must show *327 that it would be inequitable to hold her liable for the resulting deficiency. Sec. 6013(e)(1)(D). We determine whether it is inequitable to hold petitioner liable for the deficiency in tax after taking account of all facts and circumstances. Hayman v. Commissioner, supra at 1262; Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989); see also sec. 1.6013-5(b), Income Tax Regs.
The existence of a significant personal benefit to the relief-seeking spouse, while no longer a statutory impediment, [9] is a material factor to be considered when determining whether it would be inequitable to hold that spouse liable for the understatement in tax. Hayman v. Commissioner, supra at 1262; Estate of Krock v. Commissioner, supra at 678. However, normal support is not a significant benefit for this purpose, Hayman v. Commissioner, supra at 1262; Ianniello v. Commissioner, T.C. Memo. 1991-415, and normal support is determined by using a subjective standard based on the taxpayer's personal circumstances, *328 Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975). See also Flynn v. Commissioner, 93 T.C. 355, 367 (1989). Because petitioner had reason to know of the 1981 substantial *329 understatement of tax, we need not address whether it would be inequitable to hold her liable for that understatement. Cf. Bokum v. Commissioner, 992 F.2d at 1134; Silverman v. Commissioner, T.C. Memo. 1994-153. We therefore limit our discussion of this requirement of the statute to petitioner's 1982 tax year. Respondent incorrectly argues that petitioner personally benefited from the 1982 substantial understatement of tax. For 1982, the Goldmar, Ltd., deduction resulted in a reduction of less than $ 11,000 in the tax paid for that year. In view of petitioner's and Mr. Abrash's gross income of $ 359,967, a reduction on this order could not result in a discernably higher standard of living for petitioner and her family. Cf. Hayman v. Commissioner, supra at 1263 (although there was no evidence that wife had a lavish lifestyle, she benefited from the understatement of tax merely because she and her family were able to maintain a higher standard of living). The record also shows that petitioner received no more than normal support from Mr. Abrash during the years at issue and those *330 years immediately following. Petitioner did not travel extensively during the years at issue, taking only an occasional vacation trip to Florida and one trip to Japan to attend a wedding. Nor did Mr. Abrash increase the amount he spent on gifts for petitioner. Although petitioner and Mr. Abrash purchased and substantially renovated a new house during 1982, three-quarters of the purchase price was financed by a first mortgage loan and one-third of the renovations were financed through a home improvement loan. Similarly, the Florida condominium and two Shelter Island cooperative apartments acquired by petitioner or petitioner and Mr. Abrash were also purchased primarily with borrowed funds. This financing, when coupled with petitioner's and Mr. Abrash's savings and the proceeds from the sale of their first house, gave them the financial wherewithal to purchase the new house and the investment properties, notwithstanding the tax reduction from the Goldmar, Ltd., deduction. See Robertson v. Commissioner, supra.
In light of these facts and circumstances, we conclude that it would be inequitable to hold petitioner liable for the 1982 understatement *331 of tax. Accordingly, petitioner satisfies all of the requirements for section 6013(e) relief for 1982. To reflect the foregoing and the parties' concessions, An appropriate order will be issued, and decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years at issue, and all Rule references are to the Tax Court's Rules of Practice and Procedure.↩
2. Petitioner has conceded that she and Bruce Abrash were not entitled to deduct, on their 1981 and 1982 income tax returns, losses from Mr. Abrash's investment in the Goldmar, Ltd., mining program to the extent that those losses exceeded 90 percent of his cash investment. Respondent has conceded that petitioner is not liable for any additions to tax under secs. 6659, 6653(a)(1) and (2), and 6661. The parties also have agreed that interest to be paid on the deficiencies is to be computed at the increased rate set forth in sec. 6621(c).↩
3. The decision to purchase the Florida condominium was made in November 1980.↩
4. At trial, we took respondent's objection under advisement. However, in the interest of judicial efficiency, we allowed petitioner to proceed with her testimony about her alleged discussions with Mr. Abrash's accountant, Leslie Hare.↩
5. Petitioner's Nov. 13, 1992, response to interrogatory 14 reads as follows: a. Q. How much time did petitioner spend in reading each return? A. Exact duration of time unknown. Reasonable inquiry has been made by petitioner and the information known or readily obtainable by petitioner is insufficient to enable petitioner to answer the substance of the question. b. Q. Were any other individuals present with petitioner while she reviewed each return? If so, list said individuals by name and current phone number. A. Improper question. The question assumes that petitioner spent time reviewing the return. c. Q. Did petitioner question any portion of each return, and if so, what did she question and who did she question? A. No recollection. Reasonable inquiry has been made by petitioner and the information known or readily obtainable by petitioner is insufficient to enable petitioner to answer the substance of the question. d. Q. Did petitioner and Bruce Abrash sign each return simultaneously? A. No recollection. Reasonable inquiry has been made by petitioner and the information known or readily obtainable by petitioner is insufficient to enable petitioner to answer the substance of the question.↩
6. Sec. 6013(e), as originally enacted, provided relief to the spouse only if the understatement of tax was due to an omission of income attributable to the other spouse. However, in 1984, Congress amended sec. 6013(e), see Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 424, 98 Stat. 494, 801-803, to provide relief to the spouse if the understatement of tax was attributable to any claim of deduction, credit, or basis for which there is no basis in fact or law. Sec. 6013(e); Hayman v. Commissioner, 992 F.2d 1256, 1260 (2d Cir. 1993), affg. T.C. Memo. 1992-228. The amendment is retroactively applicable to all open tax years to which the Internal Revenue Code applies. DEFRA sec. 424(c), 98 Stat. 803; Bokum v. Commissioner, 94 T.C. 126, 137-138 n.13 (1990), affd. 992 F.2d 1132↩ (11th Cir. 1993).
7. This is the same standard previously adopted by the Courts of Appeals for the Eighth and Ninth Circuits. Erdahl v. Commissioner, 930 F.2d 585, 589 (8th Cir. 1991), revg. and remanding T.C. Memo. 1990-101; Price v. Commissioner, 887 F.2d 959, 963↩ (9th Cir. 1989), revg. an Oral Opinion of this Court.
8. Having stricken petitioner's testimony on her alleged discussions with Mr. Hare, see supra↩ p. 15, we also disregard her argument that she could rely on his statement that "everything was in order."
9. Sec. 6013(e)(1)(C), as originally enacted, Act of Jan. 12, 1971, Pub. L. 91-679, sec. 1, 84 Stat. 2063, specifically required that we consider "whether or not the * * * [relief-seeking] spouse significantly benefited directly or indirectly from the items omitted from income". However, Congress removed this requirement from the statute when it amended sec. 6013(e) in 1984. DEFRA sec. 424, 98 Stat. 801-803; see also Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989). The amendment is retroactively applicable to all open tax years to which the Internal Revenue Code applies, including petitioner's 1981 and 1982 tax years. See DEFRA sec. 424(c), 98 Stat. 803; Bokum v. Commissioner, 94 T.C. at 137-138↩ n.13.