T.C. Memo. 2003-18

UNITED STATES TAX COURT

PATRICIA BARRANCO, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 819-01, 820-01.    Filed January 21, 2003.

Neil V. Birkhoff, for petitioner.

Dustin M. Starbuck, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  In these consolidated cases, petitioner seeks relief from joint and several liability under section 6015(b) and (f) with respect to joint returns that she and her husband filed for 1983 through 1992.[1]

---

[1] References to secs. 6015 and 7491 are to those sections as added to the Internal Revenue Code by the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, secs. 3001(a) and 3201, 112 Stat. 726, 734.  Unless
(continued...)

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate herein by this reference. When she petitioned this Court, petitioner resided in Blacksburg, Virginia, with her husband, Dr. Salvatore D. Barranco (Dr. Barranco).

I. Personal History/Household Management

Petitioner and Dr. Barranco were married during all the years at issue, as well as up through the trial of this case. They have three daughters and a son.

When petitioner married Dr. Barranco in 1961, she was in her second year of nursing school; he was in medical school. Since getting married, she has not received other formal education or gainfully worked outside the home.

During the years at issue, Dr. Barranco was a financially successful orthopedic surgeon in private practice in Blacksburg, Virginia. In 1983, he was a 50-percent shareholder of the medical practice corporation in which he practiced. During the remaining years at issue, he was the sole shareholder of the corporation. Petitioner was not involved in Dr. Barranco's medical practice, and he did not usually discuss it with her.

---

[1](...continued)
otherwise indicated, all other section references are to the Internal Revenue Code in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure.

For the first 15 years of the Barrancos' marriage, petitioner handled family financial matters, paying the family bills out of a checking account.  About 1976, Dr. Barranco assumed a large part of this responsibility and eventually engaged the services of various accountants to assist him.  He began having family bills sent directly to his office, where he would write checks to pay them.  He also began providing petitioner a monthly "stipend" to cover household expenses such as for groceries, clothing, and incidentals.  Petitioner might use any residual amount of the stipends to pay other charges on her own credit cards.  (Otherwise, Dr. Barranco would pay her credit card charges along with other family bills.)  During the years at issue, the stipend ranged from $2,000 to $3,000 a month.  Each year, Dr. Barranco also gave petitioner an additional monthly stipend payment of like amount to buy Christmas gifts for their children.

The Barrancos' discussions of family finances related primarily to the adequacy of petitioner's stipend and, on occasion, to the financing of the various real estate purchases discussed below.

II.  The Barrancos' Major Financial Expenditures

    A.  Real Estate Purchases

Beginning before and continuing into the years at issue, petitioner and Dr. Barranco purchased, with funds provided by Dr. Barranco, various parcels of Virginia real estate, as follows:[2]

| Date | Property Purchased |
|------|--------------------|
| 09/1975 | 5.024 acres in Woodland Hill Estates |
| 01/1976 | Two lakeside lots of undisclosed acreage at Smith Mountain Lake, for about $35,000 |
| 10/1980 | 9.119 acres in Mountain View Estates |
| 12/1982 | 5.000 acres in Woodland Hill Estates |
| 07/1983 | 5.050 acres in Woodland Hill Estates |
| 11/1983 | 5.020 acres in Woodland Hill Estates |

In 1977, the Barrancos built a vacation home on one of the lakeside lots at Smith Mountain Lake.  In 1983, they constructed their primary residence on one of their Woodland Hill Estates parcels.[3]

Initially, the Barrancos held title to all these properties (both acreage and improvements) as tenants by the entirety.  On April 21, 1986, Dr. Barranco gave petitioner his interest in all these properties.

Meanwhile, in October 1984, petitioner had purchased in her own name, with funds that Dr. Barranco had provided, an additional 100.7 acres of land adjacent to the 29-plus acres they

_____

[2] Unless otherwise noted in the chart, the record does not reveal the cost of these properties.

[3] The record is silent as to the Barrancos' personal residence before 1983.

had previously acquired in Woodland Hill Estates and Mountain View Estates.

In 1985, the mortgage on the Smith Mountain Lake vacation home was paid off.  In 1989, at an undisclosed cost, the Barrancos remodeled the vacation home.

B.  Family Vacations

In 1984 or 1985, the Barrancos took their son to Scandinavia for a couple of weeks.  Also during the years at issue, the Barrancos took three of their children on a bus tour of Italy, and petitioner and Dr. Barranco took a snow-skiing trip to France with the Atlanta Ski Club.  In addition, during the years at issue, Dr. Barranco took a couple of snow-skiing trips to Switzerland with his son, and he also took annual week-long snow-skiing vacations in Colorado.

C.  Daughters' Weddings

During the years at issue, each of the Barrancos' daughters got married.  Dr. Barranco spent approximately $8,000 to $10,000 on each wedding.  Petitioner helped plan these weddings but did not know the total cost.

D.  Gifts

For each year at issue, petitioner generally spent at least $500 to $1,000 for Christmas presents on each of the Barrancos' four children.  Dr. Barranco also made gifts to the children during the years at issue, including these significant gifts, all

made with petitioner's knowledge: In 1982 or 1983, a Fiat sports car for one daughter; in 1984, a Mazda 626 automobile for another daughter; in 1985, a horse for one daughter; and in 1988, a Ford Probe automobile for the son.

Dr. Barranco's Christmas gifts to petitioner during the years at issue included what she describes as "nice jewelry" and a fox jacket. His anniversary gifts to her during these years included a diamond engagement ring and another piece of diamond jewelry.

### E. Other Cars and Boats

Every 2 or 3 years, Dr. Barranco bought petitioner a new station wagon. From 1982 until 1987, Dr. Barranco drove a Porsche automobile provided by his medical practice corporation. About 1988, he began driving a Mercedes, also provided by his medical practice corporation. In 1991, Dr. Barranco bought himself a Mazda Miata.

During the mid-1970s, the Barrancos used funds earned by Dr. Barranco to acquire a boat, titled in both their names. In the early 1980s, the Barrancos traded in this boat and, with funds earned by Dr. Barranco, bought another one, titled only in petitioner's name.

### F. College Tuition

During each year from 1983 to 1991 inclusive, at least one of the Barranco children was in college. (During 5 of the years

at issue, two or more of the Barranco children were concurrently enrolled in college.) Two of the children attended public universities out of State, one attended a private university out of State, and one attended an in-State university. Dr. Barranco paid the tuition, room, board, and related fees for each child. Petitioner knew that Dr. Barranco was paying these expenses, although she was unaware of the exact amounts.

III. Dr. Barranco's Tax Evasion Scheme

For each year at issue, Dr. Barranco sought to evade income taxes by diverting income generated by his medical practice. His means of this attempted tax evasion was to write checks payable to various fictitious individuals or organizations set up by his New York City accountant. These fraudulent "payments" were then claimed as deductions on the corporate tax return. After taking 10 percent of the fraudulent "payments" as a fee, the New York City accountant would apply the remaining 90 percent of the proceeds as Dr. Barranco directed, making deposits into checking accounts and funds that Dr. Barranco could draw from as needed, or else into an escrow account that Dr. Barranco used for investment purposes. Dr. Barranco carried out these acts of tax evasion without petitioner's knowledge, consent, or acquiescence.

IV. The Barrancos' Tax Returns

For each year at issue, petitioner and Dr. Barranco filed a joint Federal income tax return. On these joint returns, they

reported taxable income and adjusted gross income as indicated below, omitting certain amounts of gross income as a result of Dr. Barranco's tax evasion scheme and thereby giving rise to additional tax due, as also indicated below:[4]

| Tax Year | Taxable Income Reported | Adjusted Gross Income Reported | Gross Income Omitted | Additional Tax Due |
|----------|------------------------|-------------------------------|---------------------|--------------------|
| 1983 | $5,678 | * | $805,819 | $303,565 |
| 1984 | 78,722 | * | 553,518 | 189,632 |
| 1985 | 32,678 | * | 643,356 | 257,847 |
| 1986 | 47,709 | * | 521,829 | 185,239 |
| 1987 | 8,293 | $63,407 | 600,934 | 180,925 |
| 1988 | 6,932 | 49,881 | 467,012 | 106,855 |
| 1989 | 84,965 | 124,968 | 625,858 | 138,487 |
| 1990 | 100,375 | 146,371 | 593,846 | 123,920 |
| 1991 | --- | 57,027 | 602,499 | 153,317 |
| 1992 | 248,397 | 290,978 | 464,142 | 53,938 |
| | 613,749 | 732,632* | 5,878,813 | 1,693,725 |

* For 1983-1986, there is no evidence in the record from which the adjusted gross income reported by petitioner and Dr. Barranco can be determined.

Petitioner neither reviewed these joint income tax returns nor questioned Dr. Barranco about any entries on them.

V.    Dr. Barranco's Guilty Plea and Incarceration

In May 1995, Dr. Barranco pleaded guilty to conspiring to defraud the Internal Revenue Service and evade taxes with respect to his medical practice corporation for the years 1983 through 1992 and to willfully evading taxes on omitted taxable income in excess of $1 million for the years 1987 through 1992.

---

[4] As far as the record reveals, on the Barrancos' originally filed individual income tax returns for the years at issue, Dr. Barranco's medical practice earnings were reported, apparently incorrectly, on Schedule C, Profit or Loss From Business.  These amounts of reported Schedule C earnings were apparently net of the fraudulent deductions claimed on the corporate returns for Dr. Barranco's medical practice corporation.

In conjunction with his plea arrangement, Dr. Barranco filed amended individual income tax returns reporting his previously omitted gross income for the tax years at issue. Petitioner did not participate in preparing the amended tax returns filed pursuant to Dr. Barranco's plea arrangement. Only the 1988 amended tax return bears a signature purported to be petitioner's.

In February 1996, Dr. Barranco was sentenced to 27 months' incarceration, which he began serving in March 1996. While Dr. Barranco was incarcerated, his medical practice corporation continued to pay him a $3,000 monthly salary.

## VI. Petitioner's Transfer of Property to Children

As previously discussed, in the 1980s petitioner became the sole titleholder of several real properties that had been acquired with funds provided by Dr. Barranco. These real properties included about 130 acres in or adjacent to Woodland Hill Estates, the Barrancos' primary residence situated therein, and the Smith Mountain Lake vacation home and lots. In July 1996, petitioner deeded all these real properties to a newly established limited liability company that her four children owned. In exchange, petitioner received the children's note in the principal sum of $617,400, payable at 3-percent interest in 179 equal payments of $1,987.89 each, and a final balloon payment of $518,532, due August 1, 2011.

In June 1997, the limited liability company transferred back to petitioner, for no consideration, the primary residence and the 5.024-acre Woodland Hill Estates parcel on which it was situated.

## VII.   Dr. Barranco's Release

In September 1997, Dr. Barranco was released from prison after serving 18 months of his 27-month sentence.  He has since resumed his medical practice.  At the time of trial, he resided with petitioner in their primary residence.

## VIII.   Petitioner's Request for Administrative Relief

On or about June 3, 1999, petitioner submitted to respondent a Form 8857, Request for Innocent Spouse Relief, requesting relief from joint and several liability for the tax years 1983 through 1992 for additional tax that was not shown on the joint tax returns that she and Dr. Barranco had originally filed.  On October 20, 2000, respondent issued petitioner a notice of determination denying the requested relief for the 1988 tax year.  On that same date, with respect to all the remaining tax years at issue (i.e., 1983-87 and 1989-92), respondent issued petitioner a notice of deficiency, determining therein that petitioner's taxable income for those years should be increased to include the income diverted through Dr. Barranco's tax evasion scheme.

OPINION

For 1988, petitioner has filed a stand-alone petition pursuant to section 6015(e)(1) contesting respondent's final determination denying her claim for relief from joint and several liability for that year. For all other years at issue, petitioner seeks relief from joint and several liability by raising the matter as an affirmative defense in her petition for redetermination invoking this Court's deficiency jurisdiction pursuant to section 6213(a). For all years at issue in these consolidated cases, petitioner requests relief from joint and several liability under subsections (b) and (f) of section 6015.[5]

## I. Statutory Background

As a general rule, spouses filing a joint Federal income tax return are jointly and severally liable for the full tax liability. Sec. 6013(d)(3). Section 6015 contains various exceptions to this general rule. Section 6015(b) provides as follows:

> SEC. 6015(b). Procedures for Relief From Liability Applicable to All Joint Filers.--
>
> > (1) In general.--Under procedures prescribed by the Secretary, if--
> >
> > > (A) a joint return has been made for a taxable year;

---

[5] Sec. 6015 applies to any tax liability that was unpaid as of July 22, 1998. RRA 1998 sec. 3201(g), 112 Stat. 740.

(B) on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

Failure to meet any of the section 6015(b)(1) requirements precludes the granting of relief. In the instant cases, the parties dispute the following two requirements: (1) Whether petitioner knew or had reason to know of the understatements when signing the joint returns for the tax years at issue, and (2) whether it is inequitable to hold petitioner liable for the tax

- 13 -

deficiencies attributable to the understatements.[6]  Petitioner

bears the burden of proof.  See Rule 142(a); <u>Grossman v.</u>

<u>Commissioner</u>, 182 F.3d 275, 279 (4th Cir. 1999), affg. T.C. Memo

1996-452.[7]

## II.  <u>Actual or Constructive Knowledge</u>

To qualify for relief under section 6015(b), petitioner must

establish that she did not know and had no reason to know that on

the joint returns there were understatements of tax attributable

to Dr. Barranco's omitted medical practice income.  See sec.

6015(b)(1)(C).

We are convinced that petitioner had no actual knowledge of

the understatements.  Accordingly, we focus on the issue of

whether she had reason to know of the understatements.

---

[6] Respondent also argues that petitioner is ineligible for
relief under sec. 6015 with respect to the 1988 tax year, because
she signed the 1988 amended return with Dr. Barranco.
Consequently, respondent contends, there is no 1988
understatement within the meaning of sec. 6015(b)(1)(B).
Petitioner disputes that she signed the 1988 amended return.
Because we decide that petitioner has failed to satisfy other
statutory requirements for relief under sec. 6015(b), it is
unnecessary to reach this issue, and we do not.

[7] Effective for court proceedings arising in connection with
examinations commencing after July 22, 1998, if certain
requirements are met, sec. 7491(a) shifts the burden of proof to
the Commissioner.  RRA 1998 sec. 3001(a), 112 Stat. 726.
Petitioner has neither alleged that sec. 7491(a) applies nor
established that the preconditions to its applicability have been
met.  Moreover, because sec. 6015(b)(1)(C) specifically requires
the relief-seeking spouse to establish that he or she did not
have actual or constructive knowledge of the understatement, the
provisions of sec. 7491(a) are inapplicable with respect to this
issue.  See sec. 7491(a)(3).

A spouse has reason to know of an understatement "if a reasonably prudent taxpayer in * * * her position, at the time * * * she signed the return, could be expected to know that the return contained an understatement or that further investigation was warranted. * * *  The spouse seeking relief has a 'duty of inquiry'."  Butler v. Commissioner, 114 T.C. 276, 283-284 (2000) (citations omitted).

In deciding whether a spouse had reason to know of an understatement, a key factor is the extent to which family expenditures, of which the spouse had knowledge, exceeded reported income.  See Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979); Hammond v. Commissioner, T.C. Memo. 1990-22, affd. 938 F.2d 185 (8th Cir. 1991).[8]  Other relevant factors include the spouse's education level; her involvement in the family's business and financial affairs; the presence of lavish or unusual expenditures as compared to the family's past income levels, income standards, and spending patterns; and the culpable spouse's evasiveness and deceit concerning the couple's finances. See Butler v. Commissioner, supra at 284.

Although petitioner did not review the joint returns before signing them, she is charged with knowledge of their contents.

---

[8] Cases interpreting former sec. 6013(e) "remain instructive as to our analysis of whether a taxpayer 'knew or had reason to know' of an understatement pursuant to new section 6015(b)." Butler v. Commissioner, 114 T.C. 276, 283 (2000).

See <u>Hayman v. Commissioner</u>, 992 F.2d 1256, 1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228; <u>Terzian v. Commissioner</u>, 72 T.C. 1164, 1170 (1979).  Petitioner is thus deemed to have known, for example, the amounts of taxable income and adjusted gross income reported on the joint returns.  Although the record does not reveal with specificity the total amount of adjusted gross income the Barrancos reported over the 10 years at issue, it does reveal that the total amounts reported were understated by $5,878,813.  The annual shortfalls ranged from a low of $464,142 (in 1992) to a high of $805,819 (in 1983).  For the years 1987-92 (the only years for which the record reveals the amounts of gross income reported on the Barrancos' joint returns), the omitted gross income exceeded the amounts of reported adjusted gross income by an annual average of over 670 percent.  On the basis of the limited evidence in the record, it appears that the pattern of underreporting for the years 1983-86 was similar.[9]

What became of these large amounts of omitted income?  From the limited evidence in the record, we can only conclude that they were used largely to finance the Barrancos' substantial

---

[9] The Barrancos' 1987-92 joint returns reported total adjusted gross income of $732,632 and omitted gross income of $3,354,291.  The record does not contain the Barrancos' 1983-86 joint returns or otherwise reveal the amount of adjusted gross income they reported for those years.  The record does indicate, however, that for those years the Barrancos reported total taxable income of $164,787, while omitting gross income of $2,524,522.

family expenditures during the years at issue.[10] These expenditures included, in addition to the basic living expenses required for the Barrancos to live what Dr. Barranco described as a "nice life": The purchase of over 110 acres; the construction of their primary residence; the payoff of the mortgage on their vacation home after about 8 years; the remodeling of their vacation home; several European vacations; college tuition, room, and board for each of their four children; weddings for their three daughters; diamond jewelry; and the Barrancos' purchase of several cars and a boat for themselves, as well as at least three cars and a horse for their children.

---

[10] The only direct evidence that petitioner offered on this score came from Dr. Barranco's testimony. Although Dr. Barranco testified that none of the omitted income was used to benefit the family, his testimony fails to account for the disposition of at least $4,890,932 of omitted income. More particularly, Dr. Barranco testified that 10 percent of the $5,878,813 of omitted income (i.e., about $587,881) went to the New York City accountant and that the remaining 90 percent (i.e., about $5,290,932) was placed--

> in checking accounts and funds that I could draw from
> if I needed it, and an escrow type of account which
> could be used for investment purposes and it was
> available. So it was an account that was there. If it
> was needed, I could tap into it.

Dr. Barranco testified that when the authorities uncovered his tax evasion scheme, there was $400,000 or $450,000 in the escrow account which was seized pursuant to the criminal investigation. Assuming, for sake of argument, that this representation is true, it means that at least $4,840,932 ($5,290,932 minus $450,000) of the omitted income is unaccounted for.

Petitioner was aware of all these expenditures. Although she may not have been aware of the exact dollar amounts of some of these expenditures, we believe she was generally aware of what things cost. After all, she had managed the family's personal finances for the first 15 years of the Barrancos' marriage. Throughout the years at issue, she managed the monthly stipend that she used to pay for the family's groceries, clothing, and incidental expenses. She also maintained her own credit card account. She participated in discussions with Dr. Barranco about their sizeable real estate acquisitions. She had completed a year of nursing school.

It is true that petitioner was excluded from Dr. Barranco's business affairs and was unaware of his fraudulent tax scheme. These considerations weigh in petitioner's favor. Nevertheless, in light of the totality of facts and circumstances, petitioner has failed to convince us that a reasonably prudent person in her position at the time she signed the return for each year at issue would not have had reason to know that the family expenditures greatly exceeded reported income.

For example, in 1988 the Barrancos reported adjusted gross income of $49,881, omitting gross income of $467,012. That same year, petitioner received from Dr. Barranco monthly stipends totaling at least $26,000 to cover household expenses and Christmas gifts. In order for the Barrancos to have subsisted on

the $49,881 of adjusted gross income reported on the 1988 joint return, the remaining $23,881 would have had to cover all the other expenditures the Barrancos made that year:  Basic living expenses not covered by the monthly stipend (e.g., mortgage payments, insurance, and taxes); tuition, room, and board expenses associated with two of their children's college attendance (one of whom was at a private university); the $8,000-$10,000 wedding expenses for one of their daughters; a Ford Probe for their son; and all the other items that allowed the Barrancos to "live well", as petitioner states on brief.  We are unpersuaded that a reasonably prudent person in petitioner's position would have thought that the $49,881 of gross income reported on the Barrancos' joint return was sufficient to cover all these expenditures.  The record does not suggest that the Barrancos had available to them resources other than the omitted income to support their lifestyle.

On brief, petitioner contends that the Barrancos' lifestyle was not lavish or unusual, but it was simply the "lifestyle of a hard-working orthopedic surgeon's family."  In support of this contention, petitioner states on brief that "orthopedic surgeons generally do have very good incomes".  Therein lies the rub. Although the Barrancos were enjoying the lifestyle of a "hard-working orthopedic surgeon's family" during the years at issue, Dr. Barranco and petitioner were reporting much less than the

"very good incomes" that orthopedic surgeons might generally be expected to earn to support such a lifestyle. On the basis of all the evidence, we believe that petitioner should have been aware of this discrepancy.

Petitioner testified that after Dr. Barranco commenced his medical practice (sometime well before 1983), their lifestyle "kept getting better and better" because he "was making more money * * * as far as I was concerned". Yet in 1983, the Barrancos' reported income dropped precipitously, we surmise, for in that year their joint return omitted $805,819 of gross income.[11] As previously discussed, petitioner is charged with knowledge of the amounts of income reported on the joint returns. See Hayman v. Commissioner, 992 F.2d at 1261; Terzian v. Commissioner, 72 T.C. at 1170.

The pattern persisted for the next 9 years: the Barrancos' joint returns continued to omit very large amounts of gross income even as their lifestyle kept getting "better and better". They acquired parcels of real property substantially greater than the amounts they had acquired before the tax years at issue; they

---

[11] The record does not reveal how much gross income the Barrancos reported for any year before 1983. The evidence does indicate, however, that Dr. Barranco's tax evasion activities commenced in 1983, at a time when the Barrancos' lifestyle had been steadily improving. Accordingly, we infer that in 1983 there was a falling off in the Barrancos' reported income more or less commensurate with the $805,819 of gross income that was omitted from the Barrancos' 1983 joint return.

constructed their personal residence and remodeled their vacation home; they paid college expenses for four children; they vacationed in Europe several times; and they bought numerous new cars for themselves and their children.

We believe that the ostensible falling off of the Barrancos' reported income in 1983 and subsequent years was so great, and the discrepancy between their reported income and their ever-improving lifestyle so pronounced, as to reasonably put petitioner on notice of the need to make further inquiry.  Cf. Price v. Commissioner, 887 F.2d 959, 965-966 (9th Cir. 1989).

Petitioner argues that she had no constructive knowledge of the omitted income because she never reviewed the tax returns before signing them.  Petitioner, however, "cannot be excused for her failure to review a return she signed under penalties of perjury, even though it was her habit all during her married life to sign any document her husband asked her to sign."  Terzian v. Commissioner, supra at 1170.

In sum, petitioner has failed to establish that a reasonably prudent person in her position at the time she signed any of the joint returns could not be expected to know that they contained understatements or that further investigation was warranted.

III.  Section 6015(b)(1)(D) Equity Analysis

Notwithstanding our foregoing conclusions, if we were to assume, for sake of argument, that petitioner had neither actual

nor constructive knowledge of the understatements, her claim for relief pursuant to section 6015 must still fail.  As discussed below, the evidence indicates that pursuant to section 6015(b)(1)(D) it would not be inequitable to hold petitioner liable for the deficiencies attributable to the understatements in question.

A material factor that informs our analysis under section 6015(b)(1)(D) is whether there has been a "significant benefit to the spouse claiming relief".  Jonson v. Commissioner, 118 T.C. 106, 119 (2002) (citing Hayman v. Commissioner, supra at 1262).[12]

Petitioner alleges that she did not benefit from the understatements in question.  On brief, petitioner states:  "The money that should have been paid to the Internal Revenue Service * * * was taken by * * * [Dr. Barranco's] accountant or was * * * eventually seized."  Petitioner, however, fails to account for at least $655,844 of the $1,693,725 total understatements.[13]

---

[12] The "equity" test of sec. 6015(b)(1)(D) is virtually identical to the "equity" test of former sec. 6013(e)(1)(D); therefore, cases interpreting former sec. 6013(e)(1)(D) inform our analysis pursuant to sec. 6015(b)(1)(D).  Jonson v. Commissioner, 118 T.C. 106, 119 (2002).

[13] As previously noted, Dr. Barranco testified that his accountant withheld 10 percent (i.e., approximately $587,881) of the $5,878,813 of income omitted during the 10 years at issue and that an estimated $400,000 or $450,000 was seized from his investment accounts pursuant to the criminal investigation of his tax fraud.  The understatements for the years at issue total $1,693,725.  Thus, Dr. Barranco's testimony fails to account for at least $655,844 of the total understatements ($1,693,725 minus ($587,881 plus $450,000)).

(continued...)

We have previously concluded that the Barrancos' lifestyle during the years at issue was in all probability financed in significant part by income omitted from the joint returns. Money being fungible, it follows, in the absence of contrary evidence, that their lifestyle was also financed, directly or indirectly, by the understatements.

For each year at issue, petitioner enjoyed the lifestyle afforded, directly or indirectly, by the tax savings, and petitioner thereby benefited from the tax savings. More particularly, in 1986 Dr. Barranco gave petitioner his interest in: (1) Their personal residence, which they constructed in 1983; (2) more than 29 acres underlying or adjacent to their personal residence; and (3) their lakeside vacation home.[14] In

---

[13](...continued)
In doing these mathematics, we give petitioner the benefit of the doubt by assuming, without deciding, that the accounted-for omitted income (i.e., the $587,881 paid to the accountant and the $400,000 or $450,000 allegedly seized from Dr. Barranco's investment accounts) should be counted entirely against the understatements.

In determining the $1,693,725 amount of understatements, we have assumed (consistent with petitioner's position in this proceeding), but have not decided, that she did not sign the 1988 amended return.

[14] Both petitioner and Dr. Barranco testified that Dr. Barranco made these transfers to protect his property interests from potential malpractice claimants. Respondent argues that under Virginia law, because petitioner and Dr. Barranco formerly held the real estate as tenants by the entirety, these properties would have been exempt from the claims of creditors who did not have joint judgments against petitioner and Dr. Barranco. See Rogers v. Rogers, 512 S.E.2d 821, 822 (Va. 1999) (citing Vasilion v. Vasilion, 66 S.E.2d 599 (Va. 1951)). We need not
(continued...)

1984, petitioner also acquired--with funds provided by Dr. Barranco--over 100 acres. Contrary to petitioner's suggestion on brief, we do not believe that such items represented mere "normal support". On the basis of all the evidence, we conclude that petitioner significantly benefited from the understatements in tax. See <u>Clevenger v. Commissioner</u>, T.C. Memo. 1986-149 (holding it was not inequitable to deny relief under former section 6013(e) where understatements improved a couple's jointly owned home, sole title to which the relief-seeking taxpayer received in a divorce settlement), affd. 826 F.2d 1379 (4th Cir. 1987); see also <u>Estate of Krock v. Commissioner</u>, 93 T.C. 672, 681 (1989) (requiring specific facts regarding lifestyle expenditures, asset acquisitions, and dispositions of tax savings to prove no significant benefit); <u>Von Kalinowski v. Commissioner</u>, T.C. Memo. 2001-21 (receiving $500,000 over 15 years was a significant benefit); <u>French v. Commissioner</u>, T.C. Memo. 1996-38 (rejecting the taxpayer's argument that $150,000 in certificates of deposit sourced to understatement "merely amounted to normal support" where the taxpayer could not account for how it was spent).

Moreover, since Dr. Barranco's release from prison, he has resided with petitioner in the Barrancos' primary residence (of

---

[14](...continued)
decide this hypothetical issue of Virginia law. Whatever Dr. Barranco's motives might have been in making the transfers, the fact remains that he made them. Furthermore, petitioner clearly benefited from these transfers, as illustrated by her subsequent transfer of the properties to her children in 1996, in return for their note to her in the principal sum of $617,400.

which petitioner was sole owner at the time of trial) and has resumed his medical practice, which is the couple's primary source of income. Petitioner "continues to enjoy the lifestyle and financial security that are largely attributable to her husband's assets and income." Von Kalinowski v. Commissioner, supra; see Lauer v. Commissioner, T.C. Memo. 1994-579. On the basis of all the evidence, we conclude that denial of relief from joint and several liability will not result in economic hardship for petitioner. There is no suggestion in the record of spousal abuse or duress. These considerations support our conclusion that it would not be inequitable to deny petitioner the requested relief from joint and several liability.

Accordingly, we hold that petitioner is not entitled to relief under section 6015(b).

IV. Relief Under Section 6015(f)

Petitioner contends that respondent abused his discretion in denying her request for relief from joint and several liability under section 6015(f).

Where relief is unavailable to an individual under section 6015(b), the Secretary may provide relief under section 6015(f) if "taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either)". Sec. 6015(f). Essentially the same language appears in the equities test of section 6015(b)(1)(D). Butler v. Commissioner, 114 T.C. at 291. Having concluded, in light of all the facts and circumstances,

that it is not inequitable to deny petitioner the requested relief under section 6015(b)(1)(D), it follows that respondent did not abuse his discretion in denying relief under section 6015(f).  See Alt v. Commissioner, 119 T.C. ___ (2002).

In reaching our holdings, we have considered all arguments the parties have made.  Arguments not addressed herein we have concluded are irrelevant or without merit.

To reflect the foregoing,

Decisions will be entered for respondent.