T.C. Memo. 2005-209


UNITED STATES TAX COURT


LINDA K. HALTOM, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 17595-03.              Filed September 6, 2005.


<u>Donald R. Williams</u>, for petitioner.

<u>Audrey M. Morris</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HOLMES, <u>Judge</u>:  Jerry Haltom embezzled over $765,000 between 1989 and 1994.  He was caught, convicted, and imprisoned for both mail fraud and evading the tax owed on the embezzled income.  Before he was caught, his wife Linda worked at home raising their children, running the household, and occasionally earning some money in a part-time job.  The Haltoms filed joint returns that

failed to report the embezzled income, and Linda now seeks innocent spouse relief under section 6015(b) and (f) from the resulting deficiencies. [1]

FINDINGS OF FACT

Linda and Jerry Haltom wed in 1974, and settled in Smyer, a small town in West Texas where they reared their two children. Jerry is a college graduate who took courses in accounting and earned a degree in business administration. He worked for many years as a food broker at Oliver Taylor Company West, Inc. While Jerry advanced at the Taylor Company, Linda cared for their children and ran the household. She had no formal education beyond high school, and rarely worked outside the home until 1994.

Food brokerage is part salesmanship and part marketing, and Jerry's job was to work with food manufacturers such as Del Monte, Heinz, and Capri Sun to get their products into supermarkets and wholesalers throughout West Texas. He drew a salary, but would often more than double that income through commissions, bonuses, and awards.

By the late 1980s, a culture of fraud had taken hold in several West Texas food brokerage companies. Over several years, 18 people from three different firms were convicted for cheating

---

[1] All references to sections are to sections of the Internal Revenue Code, and the one reference to a Rule is to the Tax Court Rule of Practice and Procedure 155.

their clients in various ways.  Jerry Haltom was one of these eighteen.  As described by the Fifth Circuit,

> Haltom exploited his position by perpetuating a false invoice scheme against his clients, the manufacturers. In simple terms, he claimed a greater amount in promotional funds than was owed the wholesalers and retailers, and he pocketed the difference. Unsurprisingly, he failed to report this illicit income on his federal income tax returns. Haltom stipulated that he misappropriated $766,618 from the food manufacturers and cheated the government of $100,838 in taxes for 1989, 1990, 1991, and 1992.

United States v. Haltom, 113 F.3d 43, 44 (5th Cir. 1997).

In October 1994, federal investigators raided the Taylor Company's offices.  In February 1996, Jerry was charged by information with one count of mail fraud and four counts of tax evasion.  In June 1996, he pled guilty and was sentenced in district court to serve 26 months in prison, followed by three years of probation.

The criminal investigation triggered an audit of the Haltoms' tax returns for 1989-94.  Besides discovering that the Haltoms had not reported Jerry's embezzlement income, the IRS also discovered that during those years Linda had earned $4,104 under the name "Dela's Demos"--sporadic employment passing out samples to customers in local supermarkets.  The Haltoms reported neither the gross receipts nor calculated the net taxable income from Dela's Demos on their returns.  Linda testified that she believed it was not enough income to report, but this was true only of 1991.  She should have reported additional net taxable

income of $439 in 1990 and $1,552 in 1992.

At the end of the audit, the IRS agent presented the Haltoms with a completed Form 4549-CG that described in detail the calculations performed to arrive at the deficiency amounts. By signing the form, the Haltoms agreed that their total deficiency from 1990 to 1993 was over $145,000. The Commissioner also added fraud penalties against Jerry that totaled over $100,000. Interest (computed only through the end of March 1997) brought the total liability to over $370,000.

Throughout their marriage, and including the years for which she is seeking relief from this very large liability, Linda shared a joint checking account with her husband into which they deposited their paychecks. Both spouses had signature authority over the account, but Linda managed it, made most of the additional deposits to it, and wrote most of the checks on it that went to pay household bills.

Jerry, however, kept five other accounts at five different banks, including one in the Caribbean isle of Antigua. He alone had signature authority on these accounts. While Linda knew that Jerry had an account of his own for business, she was not aware that there was more than one account or of the balances in any of them, since Jerry took care to receive the statements at his office. He deposited all of his embezzlement income and whatever prize money and bonuses he received into these five accounts, and

tracked them on his office computer.

Jerry moved some of the money out of those accounts into places where it was conceivable that Linda might have noticed it. He invested over $5,000 with A.G. Edwards and another $70,000 with Equitable, and on their 1991 return, the Haltoms did report dividend income of over $5,700 from the Equitable account. Both investments generated regular monthly statements that were sent to the Haltoms' post office box. Linda picked up these statements along with the rest of the mail, but did not open them.

Then there was the money that Jerry spent. While Linda paid most of their household expenses out of the joint checking account, Jerry paid some of the larger expenses out of his own five accounts-including an addition to their home, new furniture, a new pool, landscaping, and some other large-ticket items. He also made installment payments on his cars, first an Audi and then a Mercedes (though he lied to Linda and said these were both Taylor Company cars). All of Jerry's payments during 1990, 1991, and 1992, including those for the cars, totaled $137,427.[2]

---

[2] The parties grouped them into several categories:

| | |
|---|---|
| House payments | $ 10,666 |
| Car payments | 39,336 |
| House addition | 26,386 |
| Personal | 15,538 |
| Furniture | 13,354 |
| Landscaping | 9,815 |
| Insurance | 9,218 |
| Club expenses | 4,060 |

(continued...)

(While tax year 1993 is also at issue, there is no detailed evidence of cash flow for that year.) Jerry also gave checks totaling $30,290 drawn on two of his accounts to Linda as extra money when she needed it.

Each year, Linda would gather the W-2s, 1099s, and canceled checks to take to their accountant for him to prepare their tax return. While Jerry gave Linda the tax information from his job and some of his investment accounts, he carefully excluded anything that would have alerted her to his embezzlement. The accountant prepared the forms, which the Haltoms then signed and timely filed. For the four tax years at issue, their total reported adjusted gross income was $330,804. For the three tax years 1990 through 1992 for which the parties provided spending information, it was $205,828. Linda now works as a dental technician and earns about $25,000 per year. Jerry is once again a salesman. Their total income for tax year 2002 was about $116,000.

Linda filed Form 8857, Request for Innocent Spouse Relief,

---

[2](...continued)

| | |
|---|---|
| Contributions | 2,610 |
| Children's expenses | 2,408 |
| Piano | 2,250 |
| Pool construction | 1,786 |
| Total | $ 137,427 |

The "Club Expenses" category includes payments to a local country club and fitness club totaling $4,054. Only Jerry benefited from the club expenses and the car payments.

for the years 1989-94, which the Commissioner considered and denied in 2002.  He based his decision on Linda's having reason to know of the embezzlement and receiving a significant benefit from it.  Linda does not appeal his denial of relief for tax years 1989 and 1994--there was neither an understatement nor an underpayment of taxes for those years, one of which must be present for her to qualify for relief under section 6015--but did petition the Tax Court for review of his denial of relief for 1990-93.  The case was tried in Lubbock.  The Haltoms remain married and have always been residents of Texas.

OPINION

Spouses who sign joint returns are jointly and severally liable for their accuracy and the full tax shown.  See sec. 6013(d)(3).  Section 6015, however, provides relief from that liability to qualifying "innocent spouses," and Linda asks for relief under subsections 6015(b) and (f).  These subsections address the same general problem but differ in important ways. Relief under subsection (f) is available for a spouse who shows that "taking into account all the facts and circumstances, it is inequitable to hold [her] liable for any unpaid tax or any deficiency (or any portion of either)."  Success in our Court under this subsection depends on proof that the Commissioner abused his discretion in denying relief.  Subsection (f) cases rarely depend on one factor alone--even though the Commissioner

has described some of the factors that he will look at and weigh, his list is not exhaustive. Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. 447, 448; see also Ewing v. Commissioner, 122 T.C. 32, 48-49 (2004).

Relief under subsection (b), in contrast, doesn't even require a determination by the Commissioner denying relief before this Court can grant it. Butler v. Commissioner, 114 T.C. 276, 288 (2000). A petitioner under this subsection generally has the burden of proof, but need only persuade us by a preponderance of the evidence rather than prove that the Commissioner abused his discretion. See McClelland v. Commissioner, T.C. Memo 2005-121. Section 6015(b)(1) is also similar to former section 6013(e)(1), which means there is a body of precedent to which we look when analyzing parallel provisions of section 6015. Butler, 114 T.C. at 283; see Jonson v. Commissioner, 118 T.C. 106, 119 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

A requesting spouse may qualify for relief under section 6015(b) if:

    (A) a joint return has been made for a taxable year;

    (B) on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return;

    (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such an understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects * * * the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election * * *.

These requirements are stated in the conjunctive, so a spouse must satisfy all five to receive relief from joint and several liability under section 6015(b).

Both parties agree that Linda has met requirements (A), (B), and (E): the Haltoms filed joint returns, Jerry was solely responsible for the embezzlement income, and Linda requested relief within the statutory period.  They disagree about whether Linda has met the remaining requirements; namely, that she had no reason to know of the income omitted from the returns and that holding her liable for the tax deficiencies would be inequitable. We consider both.

A.  Knowledge or Reason To Know--Section 6015(b)(1)(C)

Both Linda and the Commissioner agree that she did not actually know of the embezzlement and thus did not actually know of the omitted income at the time she signed the returns.  The key question is whether she had reason to know.  Sec. 1.6013-5(a)(3), Income Tax Regs., superseded by sec. 1.6015-2, Income

Tax Regs.[3]  Our precedents taught us that this meant whether "a reasonably prudent taxpayer in his or her position, at the time he or she signed the return, could be expected to know that the return contained an understatement or that further investigation was warranted."  Butler, 114 T.C. at 283; see also Park v. Commissioner, 25 F.3d 1289, 1293 (5th Cir. 1994), affg. T.C. Memo. 1993-252.  In shorthand form, this means that a spouse seeking relief has a "duty of inquiry."  Butler, 114 T.C. at 283.

This duty is a subjective test--its focus is on the individual seeking innocent spouse relief.  It recognizes that the suspicions of a spouse who is a highly skilled lawyer or accountant should reasonably be triggered more easily than a stay-at-home mom with a high school education.  Compare Ohrman v. Commissioner, T.C. Memo 2003-301 (requesting spouse was lending officer at two large banks who controlled the family finances), with Pietromonaco v. Commissioner, 3 F.3d 1342, 1345-1347 (9th Cir. 1993) (requesting spouse was stay-at-home mom with high school education), revg. T.C. Memo. 1991-472.  We have a large

---

[3] Section 6015 took effect on July 22, 1998, but the regulations interpreting the section didn't take effect until July 18, 2002.  See sec. 1.6015-2, Income Tax Regs.  For requests (like the one at issue in this case) made during the intervening four years, we apply the regulations interpreting section 6013, the predecessor of section 6015, in cases arising under section 6015(b).  See Kling v. Commissioner, T.C. Memo. 2001-78; Braden v. Commissioner, T.C. Memo. 2001-69.  See generally Shirley v. Commissioner, T.C. Memo. 2004-188 (proper to use regulations of repealed section if new section nearly identical).

number of examples from caselaw to help us decide where on the spectrum the case before us lies.

That precedent points us to a few key factors: (a) the spouse's education level; (b) her involvement in the family's business and financial affairs; (c) the presence of lavish or unusual expenditures as compared to the family's past income levels, income standards, and spending patterns; and (d) the culpable spouse's evasiveness and deceit concerning the couple's finances. Butler, 114 T.C. at 284.

We note first that Linda's education ended with high school. Unlike her husband, she has taken neither college nor business classes. The Commissioner argues that she continued her education through life experience by running Dela's Demos, but this was a part-time job where she set up tables and passed out samples at grocery stores. Nothing from that job could conceivably have provided her with the financial sophistication to suspect that her husband may have been embezzling money and hiding some of it offshore.

The second factor is Linda's involvement in the family's financial affairs. Both parties agree that she paid for most of the everyday expenses out of her checking account and thus certainly had some general awareness of her family's financial situation. The Commissioner argues that Linda's habit of picking up the mail from the post office each day meant that she should

be charged with knowing about Jerry's investment accounts. The Commissioner believes that this alone should have been enough to make her suspicious. We disagree. In today's society, simply receiving a letter from a financial institution will make a reasonable person suspect only that her family has somehow made its way onto a marketer's mailing list, not that her spouse has money hidden away. It certainly would not be enough to compel her to open the statements to check the account balances.

The Commissioner also points to Linda's receiving checks from Jerry written from two different accounts. He argues that this should have caused her to suspect that he had multiple accounts of his own, concluding again that he must have money hidden away. We again disagree. Having more than one account is not necessarily a particularly suspicious act, especially for a prosperous businessman. Without some other sign of dishonesty, noticing the different account numbers on the bottom of the checks would not make a reasonable person in Linda's position suspect anything other than Jerry had a business need for more than one account.

We next look to see if there were large or lavish expenses. Courts have been careful to consider whether a family's expenses were reasonable in relation to the income reported on the return. Barranco v. Commissioner, T.C. Memo. 2003-18. This is based on the commonsense observation that even a trusting wife should

notice something's up if her husband suddenly starts bringing in so much money that their standard of living suddenly becomes much better than before.

In many cases that we have decided in the Commissioner's favor, families were spending three or four or even six times the income they reported during the years in question.[4]  But that was not the case with the Haltoms.  During the years at issue, their lifestyle did not change that much.  They did pay off a mortgage, make improvements to their home, buy new furniture, and landscape their yard.  Jerry also had a membership in a country club.  Yet while these are large expenses--over $60,000 between 1990 and 1992--this spending was in line with their reported income for the years at issue.  When we exclude the car payments, which Linda believed the Taylor Company was paying,[5] the expenses that the Haltoms paid from 1990 through 1992 exceeded their reported income by less than $30,000.[6]  Given that Jerry paid many of the

---

[4] Barranco v. Commissioner, T.C. Memo. 2003-18; Hammond v. Commissioner, T.C. Memo. 1990-22 (two or three times as much), affd. without published opinion 938 F.2d 185 (8th Cir. 1991); Ayer v. Commissioner, T.C. Memo. 1989-614 (three times).

[5] See Ferrarese v. Commissioner, T.C. Memo. 1993-404 (Court excluded cost of entertainment when wife believed tickets were provided by husband's employer), affd. without published opinion 43 F.3d 679 (11th Cir. 1994).

[6] From 1990-92, we calculate that Jerry had about $104,000 of salary directly deposited into the joint checking account. The IRS calculated that from 1990 to 1992, Jerry spent about $140,000 on family expenses from the five accounts to which Linda
(continued...)

expenses related to remodeling their house and building the pool, expenses with which Linda had no familiarity and thus no basis for comparison,[7] the $30,000 difference was not enough for Linda to suspect that Jerry was keeping income off their returns.  See Pietromonaco, 3 F.3d at 1347 (requesting spouse had no reason to know when expenses were less than twice reported income).  Thus, we find that a reasonable person in Linda's position would not suspect that something was going on.

We note that we compared the aggregate expenses and income from 1990 through 1992.  See supra note 6 (comparing expenses and income for 1993).  This raises a potential issue unaddressed by either party--whether for *any one year* those extra expenses were so out-of-whack that they should have triggered the duty of inquiry.  Our own rough calculation is that in 1991, the Haltoms' adjusted gross income of $51,901 was less than half of their

---

[6](...continued)
did not have access.  He also gave Linda an additional $30,000 that she deposited into the joint checking account.  These amounts equal roughly $275,000.  We exclude $40,000 of payments for his cars which Linda did not know about to arrive at $235,000.  The income the Haltoms reported for those 3 years was $205,828.

In 1993, the Haltoms reported $124,976 in adjusted gross income on their tax return, while the total Mr. Haltom embezzled was $21,652; the amount embezzled was so small compared to their AGI that it would have passed unnoted amidst all their legitimate income that year.

[7] See Ferrarese, T.C. Memo. 1993-404 (neither wife nor many other recipients of Broadway tickets from husband knew how expensive they were).

expenses of $120,825.  However, we do not find this sufficient in itself to find that Linda's lack of suspicion became unreasonable that year.  First, most of that spending was on home improvements rather than deposits into their joint account, and as we already noted Linda had no familiarity with how expensive they might be.  Looking at the numbers for each calendar year might also have been misleading--especially in a business where legitimate bonus income might be clustered at the beginning or end of a year, but the spending that it fuels might occur in a different year.

The last factor is whether Jerry was in any way evasive or deceitful regarding the embezzled money.  Jerry credibly testified that he deliberately took actions to ensure that Linda would not find out about his embezzlement or his failure to report it, because he viewed her as an honest woman who would never sign a false tax return.  And when she collected from him the W-2s and other documents that their accountant needed to complete their returns, he was careful to withhold any paperwork that might cause her to question the numbers.

Linda realized that Jerry was being less than trustworthy when she learned in 1994 that investigators had raided his office.  But ever since, she has regularly checked up on him.  Jerry testified during trial:

> THE COURT:     Who in your family pays the monthly utility bills, the routine checks of that kind?
>
> THE WITNESS:   My wife does.

THE COURT: Has that always been the case?

THE WITNESS: No. Since this incident, she pays 90 percent of the bills, and she looks at my checking account now, too.

We find this testimony eminently credible. Once Linda's suspicions were triggered, instead of "burying her head in the sand" as the Commissioner has argued, she took steps to stay on top of everything happening in the family finances. But we find that her duty of inquiry was never triggered before the raid, and so conclude that Linda neither knew nor had reason to know of the income omitted from their tax returns.

B. Equitable Considerations--Section 6015(b)(1)(D)

Section 6015(b)(1)(D) requires that Linda prove that being held liable would be inequitable. The old regulation addressed inequity in only a general and open-ended way:

> Whether it is inequitable to hold a person liable for the deficiency in tax * * * is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for purposes of this determination. * * * Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse.

Sec. 1.6013-5(b), Income Tax Regs., superseded by sec. 1.6015-2,

Income Tax Regs.

The regulation's identification of "significant benefit" as a relevant factor derives from the caselaw of old section 6013(e)(1)(C), whose language was carried over nearly intact to current section 6015(b)(1)(D).  Compare sec. 6013(e)(1)(C), repealed by Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(a), 112 Stat. 734, with sec. 6015(b)(1)(D); see also Butler, 114 T.C. at 283.  And our caselaw has over time, and under both old and new sections, most heavily weighted not only whether the requesting spouse has received a significant benefit from the understatement but also whether the failure to report the correct tax liability resulted from the concealment, overreaching, or any other wrongdoing on the part of the other spouse.  See, e.g., Hayman v. Commissioner, 992 F.2d 1256, 1262 (2nd Cir. 1993), affg. T.C. Memo. 1992-228; Jonson, 118 T.C. at 119.

In deciding whether taxpayers have received a significant benefit from omitted income, we have looked to see whether money was used to pay for children's education, Jonson, 118 T.C. at 120, special purchases for either themselves or their children, Alt v. Commissioner, 119 T.C. 306, 314 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004), or frequent travel, Barranco, T.C. Memo. 2003-18.  Normal support is not a significant benefit. Jonson, 118 T.C. at 119.

Linda did not put her children through school using the money, her only real estate was the land underneath her home (which her mother had given her years before), she did not jet off to exotic locales, and she made no similar outsized purchases. The Haltoms reported a total adjusted gross income from 1990 to 1992 of $205,000. Of the $275,000 that Jerry contributed to the family finances from 1990 to 1992, $230,000 benefited Linda,[8] only $25,000 more than the income they reported. This is less than 15% of their adjusted gross income, and we do not find that to be significant.

Jerry also contributed $75,000 to investment accounts that were in his name. Since Texas is a community property state, Linda is entitled by law to half that investment. Linda has not yet benefited from this money, and since Jerry owes over $635,000 in restitution from the embezzlement, she most likely never will. Thus, we find that Linda received no significant benefit from the omitted income.

The second factor we look at is whether the failure to report resulted from wrongdoing on the part of the nonrequesting spouse. This factor weighs heavily in Linda's favor. It was, after all, Jerry who embezzled the money, not Linda, and we have

---

[8] Jerry made payments for his cars, the country club, and a fitness club. None of these payments benefited Linda. Still included in the $230,000 are the mortgage payoff, the improvements on the house, the new pool, and other items that benefited both Haltoms. See supra, note 6.

already found that she had no reason to know of either the embezzlement or its omission from their return.

The Commissioner asks us to consider a few other factors, including the Haltoms' still being married and whether Linda would be subject to economic hardship if she were to remain liable. See Alt, 119 T.C. at 314-315; sec. 301.6343-1(b)(4), Proced. & Admin. Regs. While the endurance of the marriage is relevant, we do not think it outweighs her not having a reason to know of the understatement or her not receiving any significant benefit from her husband's embezzlement.

As for economic hardship, the Haltoms' combined AGI was $109,000 in 2002. Linda currently earns around $25,000 per year, with Jerry earning the remainder. At trial, however, Jerry credibly testified that his commission rate was scheduled to decrease from three percent to one percent in November 2004. Since most of Jerry's income is commission-based, this will have a major effect on the Haltoms' total income. As such, we find Linda would be subject to economic hardship should she be liable, which supports our overall conclusion that holding her liable would be inequitable.

This leaves only the income from Dela's Demos. Any understatement caused by the failure to report that comparatively tiny income is obviously attributable to Linda, not Jerry; thus, she cannot be relieved under section 6015(b) from the tax

liability triggered by that income.  Sec. 6015(b)(1)(B); <u>Hopkins v. Commissioner</u>, 121 T.C. 73, 77 (2003).[9]

Conclusion

Linda was responsible for the income from Dela's Demos, and does not qualify for relief for that portion of the tax liability.  She does, however, qualify for relief under section 6015(b) for the much larger part of the tax liability caused by Jerry's embezzlement.

<u>A decision will be entered</u>

<u>under Rule 155</u>.

---

[9] Though, strictly speaking, Linda's failure to prove entitlement to relief under section 6015(b) for her Dela's Demos income leaves open the possibility of relief under section 6015(f), she does not argue that the Commissioner abused his discretion in denying her relief for that small part of the deficiencies, nor do we see how she could.