ESTATE OF MIRIAM KROCK, DECEASED, NANCY COLE,
ADMINISTRATOR, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6935-73, 1097-74.      Filed December 11, 1989.

*Oscar N. Persons* and *Steven M. Collins,* for the petitioner.

*Charles W. Maurer, Jr.,* for the respondent.

RUWE, *Judge:* In a notice of deficiency dated June 18, 1973, respondent determined deficiencies in the joint Federal income taxes of Edward and Miriam Krock and additions to tax for the taxable years 1965 through 1969 as follows:

| Year | Deficiency | Additions to tax sec. 6653(b) [1] |
|------|-----------|------------------------|
| 1965 | $109,600.98 | $54,800.49 |
| 1966 | 840,825.72 | 420,412.86 |
| 1967 | 811,227.64 | 405,613.82 |
| 1968 | 477,665.21 | 238,832.60 |
| 1969 | 44,878.36 | 22,439.18 |
| Total | 2,284,197.91 | 1,142,098.95 |

In a second notice of deficiency dated December 13, 1973, respondent determined a deficiency in the joint Federal income tax of Edward and Miriam Krock and an addition to

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

tax pursuant to section 6653(b) for taxable year 1964 in the respective amounts of $8,068.11 and $4,034.06.

Respondent has conceded that Miriam Krock is not liable for the additions to tax under section 6653(b) for any of the years in issue.

Edward and Miriam Krock filed separate petitions contesting the deficiencies. We have previously sustained the deficiencies and fraud additions to tax with respect to Edward Krock.[2] We have also previously decided certain issues involved in the instant consolidated cases regarding Miriam Krock's tax liabilities. *Estate of Krock v. Commissioner*, T. C. Memo. 1983-551. The sole remaining issue for decision is whether Miriam Krock was an innocent spouse within the meaning of section 6013(e). Miriam Krock died on August 29, 1978, and her estate has been substituted as a party in these cases.

FINDINGS OF FACT

Miriam Krock (Mrs. Krock) was a legal resident of Brookfield, Massachusetts, when the petitions were filed in these cases.[3]

In 1934, Mrs. Krock graduated from the Boston University Sargent College of Physical Education with a bachelor of science degree. On July 30, 1937, she married Edward Krock (Mr. Krock) and remained his wife until the date of her death. Mrs. Krock was not employed outside the home after 1956. She devoted her time to raising her two children and was also involved in various community, school, religious, and volunteer activities.

Mr. Krock had no formal education beyond the junior high school level. At an early age, he became involved in the organization, purchase, and sale of various business enterprises. During the years in issue, Mr. Krock was an internationally known financier. His business activities included many complicated and sophisticated financial transactions. During the Kennedy Administration in the early 1960's, Mr. and Mrs. Krock were frequent guests at the White House.

---

[2]*Krock v. Commissioner*, T. C. Memo. 1986-580.

[3]The facts as found in *Estate of Krock v. Commissioner*, T. C. Memo. 1983-551, are incorporated into the findings of fact.

Mrs. Krock never became involved in Mr. Krock's business activities. Mrs. Krock left the responsibility for making the family's financial decisions to her husband.

In January 1948, Mr. and Mrs. Krock purchased a 40-room residence on 500 acres of land in Brookfield, Massachusetts, for $50,000. The property included a swimming pool and tennis court, and it encompassed the largest private lake in Massachusetts. Several servants were employed, including a housekeeper, a gardener, and a chauffeur. The Krocks owned the residence and over 100 acres of the land as tenants by the entirety until June 5, 1969, when title was transferred to Mrs. Krock individually.

In 1967, Mr. Krock began cooperating with the Government in an investigation involving alleged violations of the Federal Securities Act. In 1968, he participated in over a hundred conferences with the U.S. Attorney's Office relating to the investigation. Because of Mr. Krock's involvement in the investigation, he was unable to devote much time to his business activities.

On November 22, 1968, the Grand Jury of the U.S. District Court for the Southern District of New York returned an indictment against Mr. Krock charging him with three counts of making false statements and omitting required information in a proxy statement and two annual reports of Fifth Avenue Coach Lines, Inc., and in an annual report of Defiance Industries, Inc. On November 3, 1969, Mr. Krock pleaded guilty to these charges.

The original joint income tax returns of Mr. and Mrs. Krock for the taxable years 1967, 1968, and 1969, were filed with the Internal Revenue Service in April 1970. These returns reported no tax liability for each year and claimed refunds for the years 1967 and 1968 of $39,415.96 and $2,767.91, which were paid.

Sometime in late 1968 or early 1969, Mr. Krock purchased a yacht for approximately $400,000 to $450,000. The yacht, named the "Speculator," was approximately 125 feet long. It had a stateroom and two small bedrooms, and it required a crew of at least three. Sometime after the beginning of 1970, Mr. Krock began living in the Bahamas on the Speculator. He eventually established residence in the Bahamas. Mrs. Krock moved to the Bahamas to live

with Mr. Krock. They both lived on the Speculator until sometime after September 1973, when they moved into an apartment on Paradise Island. They later moved into a house on the main island. Mrs. Krock returned periodically to the family residence in Brookfield, Massachusetts. Mrs. Krock continued to live with Mr. Krock until her death in 1978.

On April 11, 1973, a Grand Jury of the U.S. District Court for the District of Massachusetts returned a seven-count indictment against Mr. Krock charging him with income tax evasion for 1966, 1967, and 1968, and with subscribing to income tax returns containing false statements for 1966 through 1969. He did not appear for arraignment on the indictment, and a warrant was issued for his arrest. Substantial efforts were made to arrest Mr. Krock; however, he was never taken into custody. He lived in the Bahamas, at least part of the time, until his death there in July 1986.

On April 20, 1973, the Commissioner made jeopardy assessments against Mr. and Mrs. Krock, jointly and severally, for tax liabilities for the years 1965 through 1969. Notices of Federal tax liens arising from these jeopardy assessments were filed the same day. The parties instituted several actions in local courts with respect to the liens arising from these jeopardy assessments. On May 3, 1973, Mrs. Krock instituted an action in the U.S. District Court seeking a declaration that, under section 6013(e), she was not liable for the jeopardy assessments made against her and Mr. Krock. This action was dismissed. On May 22, 1973, the United States instituted an action in the same District Court seeking to inventory the Krock residence. The court denied the Government's request, but ordered Mrs. Krock to file an inventory. As of September 16, 1974, no amounts had been collected or paid on the jeopardy assessments.

Mr. and Mrs. Krock filed joint income tax returns for each of the taxable years 1948 through 1969. From the late 1950s through 1969, the joint returns were prepared by Robert J. Hurwitz, a certified public accountant. Neither Mr. Krock nor Mrs. Krock filed any Federal income tax returns subsequent to filing their 1969 return.

Mrs. Krock maintained records of her separate income and expenses for 1964 through 1969. She reported all items of personal income and deductions to Mr. Krock's secretary, Joan Robbins, who furnished the information to Mr. Hurwitz. Mrs. Krock reported the following income and deductions:

| Year | Total income | Total deductions | Net |
|------|-------------|------------------|-----|
| 1964 | $1,169.95 | $3,807.60 | ($2,637.65) |
| 1965 | 1,377.43 | 7,674.07 | (6,296.64) |
| 1966 | 1,379.52 | 5,996.04 | (4,616.52) |
| 1967 | 2,520.20 | 4,761.41 | (2,241.21) |
| 1968 | 1,113.88 | 7,065.93 | (5,952.05) |
| 1969 | 1,197.93 | 6,007.99 | (4,810.06) |

All the income that Mrs. Krock reported was from dividends, interest, or other investment income. Deductions attributable to Mrs. Krock consist exclusively of charitable contributions, medical expenses, and real estate taxes. Respondent made no adjustments to Mrs. Krock's income or deductions for the taxable years 1964 through 1969. The deficiencies determined by respondent for the years in issue arise from adjustments to income and deductions attributable solely to Mr. Krock. Mrs. Krock had no knowledge of the understatements.

Nancy Cole, Mr. and Mrs. Krock's daughter, is the estate's executrix and sole beneficiary. The residence in Brookfield, Massachusetts, is the primary asset of the estate.

OPINION

A husband and wife who file a joint return are jointly and severally liable for the tax due. Sec. 6013(d)(3). However, an "innocent" spouse is relieved of liability if he or she proves the following: (1) That a joint return has been made for a taxable year; (2) that on such return there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) that he or she did not know, and had no reason to know, of such substantial understatement when he or she signed the return; and (4) that after a consideration of all the facts and circumstances, it would be inequitable to hold him or her liable for the deficiency in income tax attributable to such substantial understatement.

Sec. 6013(e)(1),[4] as amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802 (1984-3 C.B. (Vol. 1) 309); *Purcell v. Commissioner*, 86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). Petitioner bears the burden of establishing that each of the four requirements of section 6013(e) has been satisfied. *Purcell v. Commissioner*, 826 F.2d at 473; *Flynn v. Commissioner*, 93 T.C. 355, 359 (1989); *Sonnenborn v. Commissioner*, 57 T.C. 373, 381-383 (1971); Rule 142(a).

In *Estate of Krock v. Commissioner*, T. C. Memo. 1983-551, we found that Mr. and Mrs. Krock filed joint returns for each of the years in issue. The parties agree that the understatements were attributable to Mr. Krock. Because we hold that petitioner has not proven that it would be inequitable to hold Mrs. Krock jointly and severally liable for the taxes in issue, we will not consider whether there were substantial understatements attributable to grossly erroneous items,[5] or whether Mrs. Krock had reason to know of the understatements.

Whether it is inequitable to hold a spouse liable is to be determined on the basis of all the facts and circumstances. Sec. 6013(e)(1)(D); sec. 1.6013-5(b), Income Tax Regs. A factor to be considered is whether a significant benefit was received by the spouse as a direct or indirect result of the erroneous items. Section 1.6013-5(b), Income Tax Regs. provides:

(b) *Inequitable defined.* Whether it is inequitable to hold a person liable for the deficiency in tax, within the meaning of paragraph (a)(4) of this section, is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefitted, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for purposes of this determination. Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should have been included in gross income. Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds

---

[4]The Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801-802, amended sec. 6013(e) retroactively to all years to which the Internal Revenue Code of 1954 applies.

[5]Respondent concedes that those portions of the understatements which he alleged were caused by omissions of gross income or by Mr. Krock's fraud are "grossly erroneous." See *Krock v. Commissioner*, T. C. Memo. 1986-580.

which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefitted from those items. Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse.

Section 6013(e) was amended after section 1.6013-5(b), Income Tax Regs., was promulgated. Prior to its amendment, section 6013(e) explicitly required that we consider "whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income." Although section 6013(e), as amended, no longer specifically requires us to determine whether a spouse significantly benefited from the erroneous items, this factor is still to be taken into account in determining whether it is inequitable to hold a spouse liable. See H. Rept. 98-432 (Part 2), 1501, 1502 (1984); *Purcell v. Commissioner*, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); see *Bell v. Commissioner*, T. C. Memo. 1989-107; and *Styron v. Commissioner*, T. C. Memo. 1987-25.

On brief, respondent focuses on whether petitioner failed to prove "that Miriam Krock did not significantly benefit from the understatements of tax for the taxable years 1964 through 1969." Petitioner, likewise, focuses on whether Mrs. Krock derived "a benefit from the tax understatements in issue." We agree with the parties that whether or not the putative innocent spouse derived significant benefits from the tax savings resulting from grossly erroneous items is an appropriate factor to consider in deciding whether it would be inequitable to hold the spouse liable. See *Bell v. Commissioner*, T. C. Memo. 1989-107; *Hinds v. Commissioner*, T. C. Memo. 1988-426; *DeMartino v. Commissioner*, T. C. Memo. 1986-263; J. Borison, "Innocent Spouse Relief: A Call for Legislative and Judicial Liberalization," 40 Tax Lawyer 819, 835 (1987).

Normal support is not a "significant benefit" for purposes of determining whether denial of innocent spouse relief would be inequitable under section 6013(e)(1)(D). Sec. 1.6013-5(b), Income Tax Regs.; *Flynn v. Commissioner, supra* at 367; *Purcell v. Commissioner*, 86 T.C. at 242; *Terzian v. Commissioner*, 72 T.C. 1164, 1172 (1979). Normal support is to be measured by the circumstances of the parties. *Sanders*

*v. United States,* 509 F.2d 162, 168 (5th Cir. 1975); *Flynn v. Commissioner, supra* at 367. "Unusual support or transfers of property to the spouse would, however, constitute 'benefit' and should be taken into consideration * * * " even when the benefit was received "several years after the year in which the omitted item should have been included in gross income. * * * " S. Rept. 91-1537 (1970), 1971-1 C.B. 606, 607-608.

Except for the relatively small charitable, medical, and real estate tax deductions attributable to Mrs. Krock, petitioner produced no evidence to show specific amounts expended by or on behalf of Mrs. Krock before, during, or after the years in issue. In apparent recognition of this problem regarding its burden of proof, petitioner argues that Mr. and Mrs. Krock were very wealthy people before, during, and after the years in issue and that any benefit Mrs. Krock might have derived as a result of the under-statements was within the parameters of "normal support." In support of this contention, petitioner introduced an analysis purporting to show that the Krock family had available a cash-flow that would have permitted family expenditures in excess of $900,000 for 1961, $2,000,000 for 1962, and $1,200,000 for 1963.

Even if we accept petitioner's financial analysis for the years prior to those in issue, the *availability* of funds to support Mrs. Krock for prior years does not necessarily mean that they were actually expended for that purpose. In addition, we have little evidence of specific amounts expended for Mrs. Krock's support for the years in issue and subsequent years. We are therefore not in a position to determine whether Mrs. Krock significantly benefited from the understatements in a manner that was above and beyond her "normal" support. We can, however, determine that the tax deficiencies of Mr. and Mrs. Krock for the years in issue total $2,292,266.02 and that this amount far exceeds the known tax liabilities incurred by Mr. and Mrs. Krock for previous years. We also cannot fail to make the observation that an extra $2,292,266.02 might have provided funding for "unusual" expenditures or asset acquisitions for the benefit of Mrs. Krock beyond whatever might have been "normal" support.

On brief petitioner attempts to obviate the failure to provide specific evidence of expenditures for Mrs. Krock's benefit by resorting to the following syllogism:

(1) The Krocks were wealthy prior to the years in issue, and lived a lifestyle consistent with their wealth;

(2) The Krocks' wealth was the result of Mr. Krock's business activities; it was not the result of any understatements of tax; and

(3) Throughout the years in issue, the Krocks lived a lifestyle consistent with their prior lifestyle, consistent with their previously-generated wealth, and consistent with their current reported income.

(4) Therefore, Mrs. Krock did not derive a benefit from the tax understatements in issue.

Petitioner has the burden of proving the factual premises, and we think it has failed for the following reasons:

(1) We agree that the Krocks were "wealthy" as that term is commonly used. Whether they lived a lifestyle "consistent with their wealth," however, is a highly subjective determination. Wealthy people sometimes live relatively frugal lives while others have been known to be profligate. Given the failure to prove specifics for any particular period, we can place little reliance on this premise even if accepted.

(2) We accept the premise that the Krocks' wealth was the result of Mr. Krock's business activity; we cannot accept the premise that the Krocks' wealth was not also the result of understatements of tax. The two sources are not mutually exclusive. Petitioner seems to argue that the avoidance of $2,292,266.02 did not result in producing "wealth" because the Krocks already had enough worldly goods. This is at odds with Mr. Krock's apparent state of mind when he attempted to defraud the Government of those same taxes. In any event, we feel secure in finding that in any conceivable context, the addition of over $2 million to one's assets results in added wealth.

(3) Petitioner's third premise must fall for the same reason as the first: Petitioner has failed to prove a quantifiable lifestyle for any period making it impossible to find consistency within the context of this case. Petitioner

relies on testimony of Robert Hurwitz who prepared returns for Mr. and Mrs. Krock from the late 1950's through the years in issue. Mr. Hurwitz testified that he observed no change in the lifestyle of Mr. and Mrs. Krock over the years. Mr. Hurwitz admitted, however, that he did not know the details of Mr. and Mrs. Krock's lifestyle, had never spoken with Mrs. Krock, and had never been a guest at the Krock's residence. Mr. Hurwitz prepared the analysis showing cash available to Mr. and Mrs. Krock in 1961, 1962, and 1963, but admitted that he had no knowledge of how they spent that cash. Finally, whatever knowledge Mr. Hurwitz had of the finances of Mr. and Mrs. Krock came to him through Mr. Krock in order to prepare income tax returns. It is now undisputed that Mr. Krock intentionally misrepresented his finances as part of a plan to fraudulently understate tax.

Given our foregoing observations on petitioner's failure to produce specific evidence of lifestyle expenditures and asset acquisitions, petitioner's conclusion can only be sustained if we are prepared to accept its unspoken premise that putative innocent spouses who are wealthy before, during, and after the years in which understatements of tax occur, need not produce specific evidence of expenditures and asset acquisitions because being wealthy renders the disposition of several million dollars insignificant. We are not prepared to accept this rationale. It is contrary to the aforementioned precedents placing the burden on petitioner to prove entitlement to the innocent spouse provisions.

There is some evidence in this case indicating that Mrs. Krock may have derived significant benefit from the understatements. This makes it all the more important to hold petitioner to its burden of proving facts showing that Mrs. Krock did not receive significant benefit over and above normal support. For example, in 1973 she signed an affidavit in an effort to show that she had received no benefit from the understatements in issue. In that affidavit[6] dated April 30, 1973, she stated:

[6]Respondent originally introduced the affidavit but argued that only a portion of the affidavit was admissible as an admission and that the rest should be excluded. Petitioner argued that the entire document should be admitted. On brief, respondent appears to acknowledge that, having offered the affidavit into evidence, his argument goes as much to the weight to be given certain statements in the document as it does to admissibility. We have considered the entire affidavit as being in evidence. We find it largely self-serving and

I have received no benefit directly or indirectly from the allegedly omitted income. Indeed for the past several years, I have been advancing Mr. Krock money to take care of certain of his expenses and I have been paying the better share of my household and personal expenses as well as the educational expenses of my children from my own resources.

Since Mrs. Krock's reported income prior to 1970 was not indicative of substantial income or resources of her own, we might reasonably question the source of her proclaimed financial ability to maintain the Krocks' lifestyle. This unanswered question is particularly troublesome given the fact that neither she nor her husband filed income tax returns subsequent to their 1969 return.

In 1968, when Mr. Krock was under criminal investigation, he transferred title to the family residence to Mrs. Krock. In her 1973 affidavit, Mrs. Krock indicates that this transfer satisfied a longstanding promise Mr. Krock had made and that she pressed him into action because of the difficulties he faced in 1968. She further stated:

Unfortunately, the transaction was not accomplished before two liens were placed on the property; one by a creditor, the Seaman Andwall Corporation and another creditor of Mr. Krock's, the Trans-Pacific Corporation. The liens represented claims in excess of $300,000 at the time of this transfer. Ultimately, these liens were discharged. The property today stands in my sole name and is my sole property.

The record contains no explanation of the source of funds used to discharge the over $300,000 in liens which Mrs. Krock said had been filed against the property.

Petitioner's briefs frequently refer to Mr. Krock's wealth, but we were provided with no accounting of what happened to that wealth after he became the subject of a criminal investigation in 1967 or after he and Mrs. Krock moved to the Bahamas, nor is there any accounting of Mrs. Krock's financial status after 1969. The record does, however, show that despite the existence of the jeopardy assessments and collection efforts in 1973, no part of the sizable assessed tax deficiencies had been collected as of September 1974, and there is no evidence of any payments after that date.

There is also some indication in the record that the Krocks' accumulated wealth was in jeopardy as early as

---

conclusory with regard to the innocent spouse issue and accord it importance only to the extent noted herein.

1967. At his sentencing hearing on June 28, 1971, regarding Securities Act violations, Mr. Krock's attorney stated:

Mr. Krock has been subjected to serious personal and financial embarrassment and difficulties since his decision, in 1967, to lend his assistance to the Government. Numerous shareholder derivative actions have been brought against him, and we are informed that his potential liabilities on account of these actions run into the millions of dollars. His legal position in these lawsuits will undoubtedly be jeopardized by his admission of guilt and testimony as a Government witness.

Given the indications that Mr. Krock was in financial difficulty during the latter years involved in this case, it would be inappropriate to blindly accept petitioner's thesis that any financial benefits received by Mrs. Krock during and after the years in issue were the result of previously accumulated wealth and not the result of the large understatements of tax. We observe that the understatements of tax for the years 1967, 1968, and 1969 resulted from income tax returns which were filed after Mr. Krock's aforementioned "financial embarrassment."

Neither party focused on whether Mrs. Krock derived significant benefit directly from the disposition of the omitted income or the expenditures on which the disallowed deductions were based. Significant direct benefit from the disposition of omitted income and expenditures for which erroneous deductions have been taken is also to be considered in determining the equities of applying the innocent spouse relief provisions. H. Rept. 98-432 (Part 2), 1501, 1502 (1984); *Purcell v. Commissioner,* 86 T.C. at 242. The omitted income and erroneous deductions that caused the understatements of tax are obviously much greater than the understated tax. Based upon our previous comments regarding petitioner's failure of proof, we also find that petitioner has failed to establish that Mrs. Krock received no significant direct benefit from the items of omitted income and disallowed deductions.

Finally, we think it appropriate in determining the equities in this case, to consider the fact that when Mr. Krock fled the country and became a fugitive from justice, Mrs. Krock joined him in the Bahamas. As previously

noted, we have few details on their lifestyle and expenditures during this period. However, petitioner makes no claim that the Krocks lived frugally, and it is clear that they initially lived aboard a large yacht that Mr. Krock had purchased for over $400,000 in 1968 or 1969. Petitioner argues that life in exile was a source of unhappiness for Mrs. Krock and should not be considered to be anything over and above the normal support she had become accustomed to, even if it was subsidized by Mr. Krock's evasion of their joint tax liability. We disagree. Mrs. Krock's ability to live in a foreign country with Mr. Krock, who was avoiding arrest and trial on income tax evasion charges and effectively avoiding tax collection efforts, can hardly be described as "normal support" for purposes of deciding whether it would be inequitable to sustain respondent's determinations in this case. As previously noted, petitioner cannot prove that there was no nexus between the tax understatements or the items that caused the understatements and the maintenance of this unusual lifestyle.

*Decision will be entered for the respondent.*