T.C. Memo. 2010-259

UNITED STATES TAX COURT

ROBERT B. MCGHEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27465-07.                    Filed November 29, 2010.

Charles Norman Woodward, for petitioner.

Dessa J. Baker-Inman and Bruce K. Meneely, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  Pursuant to section 6015 petitioner seeks relief from joint and several liability for unpaid Federal income taxes for 2001 and 2002.[1]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate by this reference. When he petitioned the Court, petitioner resided in Oklahoma.

Petitioner and Cynthia S. McGhee (Mrs. McGhee) have been married at all relevant times and have not been legally separated. They have four children, who were minors during the years at issue.

Petitioner has a master's degree in business administration. Since 1982 he has been a commercial airplane pilot, an occupation that keeps him away from home about 20 days each month. During the years at issue he was also active in the Air Force Reserve.

For about 10 years beginning in 1988 or 1989, petitioner and Mrs. McGhee operated an aviation training business. In 1998 or 1999 petitioner and Mrs. McGhee, as well as their aviation business, filed for bankruptcy. Their debts included significant Federal income tax and trust fund liabilities. On August 15, 2001, petitioner and Mrs. McGhee submitted to the Internal Revenue Service (IRS) an offer-in-compromise based on doubt as to collectibility offering to pay $42,000 to compromise tax liabilities totaling $582,520 for the years 1993 through 1998.[2] By letter dated September 6, 2001, the IRS accepted this offer-

---

[2]Numbers have been rounded to the nearest dollar.

in-compromise.  In 2002 petitioner and Mrs. McGhee paid the $42,000 from the proceeds of a home equity loan.

At some time undisclosed in the record, but no later than 2000, Mrs. McGhee accepted employment with the Oklahoma City law firm of Burch & George, P.C. (Burch & George).  During 2001 and until June 2002 she was Burch & George's office manager and bookkeeper.  Around April 2001 she began embezzling by periodically writing checks to herself on Burch & George's checking account.  In June 2002 she got caught.  It was then that petitioner first learned that she had been embezzling.

On June 18, 2002, Burch & George filed a civil suit against petitioner and Mrs. McGhee, asserting that Mrs. McGhee had embezzled funds and seeking recovery of the embezzled funds plus damages and costs.[3]  On October 23, 2002, criminal charges were filed against Mrs. McGhee for 23 counts of embezzlement from Burch & George over the period April 2001 through April 2002.  On January 14, 2004, Mrs. McGhee entered a no contest plea.  On May 17, 2004, she was sentenced to 20 years in prison and 30 years' probation.  On December 17, 2004, her sentence was suspended, and she was ordered to pay $213,144 of restitution to

---

[3]On Dec. 16, 2002, after the criminal proceedings had been instituted, Burch & George withdrew this civil cause of action.

Burch & George, with $60,000 due February 1, 2005, and $2,000 due each month thereafter.[4]

Initially, Mrs. McGhee deposited the embezzled funds into a Bank of Oklahoma checking account that she held jointly with petitioner.  In January 2002 she opened another Bank of Oklahoma account in her name alone and began depositing the embezzled funds into that account.  During the years at issue petitioner maintained separate checking accounts, in his name alone, at other banks.  He deposited his paychecks into these accounts, which he used to pay household expenses, including mortgage payments, utilities, and insurance.

For 2001 and 2002 Burch & George sent Mrs. McGhee Forms W-2, Wage and Tax Statement, reporting only the wages paid to her ($34,145 for 2001 and $12,253 for 2002) and none of the embezzled funds.  On or about April 8, 2002, petitioner and Mrs. McGhee filed their joint Federal income tax return for 2001.  On or about August 15, 2003, they filed their joint Federal income tax return for 2002.  On these joint returns they reported their wages but no embezzlement income.[5]  The taxes reported on these

_____

[4]Petitioner testified that he paid Burch & George $30,000 on the day of Mrs. McGhee's sentencing.  The record does not reveal what other amounts, if any, have been repaid to Burch & George.

[5]On their original 2001 joint Federal income tax return, petitioner and Mrs. McGhee reported wages of $114,874, of which $34,145 was attributable to Mrs. McGhee's wages from Burch & George.  On their original 2002 joint Federal income tax return,
(continued...)

returns were paid in full. Petitioner personally prepared these joint returns.

On February 18, 2004, Burch & George mailed Mrs. McGhee Forms 1099-MISC, Miscellaneous Income, reporting nonemployee compensation of $126,772 for 2001 and $117,587 for 2002. These amounts represented the funds that she had embezzled from Burch & George. On November 20, 2004, after the IRS had commenced an audit of petitioner and Mrs. McGhee's 2002 joint return, petitioner and Mrs. McGhee filed amended joint Federal income tax returns for 2001 and 2002, reporting as income the embezzlement proceeds reported on the Forms 1099-MISC. The 2001 amended return reflects additional tax of $40,366 and a balance due of $40,366. The 2002 amended return reflects additional tax of $33,920 and a balance due of $35,399. Respondent accepted the amended joint returns, processed them, and on February 7, 2005, assessed the tax stated on them. Neither petitioner nor Mrs. McGhee paid the balances due on the amended returns.

On March 22, 2005, petitioner filed Forms 8857, Request for Innocent Spouse Relief, requesting relief with respect to the additional taxes reported on the amended joint returns for 2001 and 2002. On August 27, 2007, respondent sent petitioner a

[5](...continued)
petitioner and Mrs. McGhee reported wages of $96,052, of which $12,253 was attributable to Mrs. McGhee's wages from Burch & George.

notice of determination denying his requests for relief. Respondent has issued no statutory notice of deficiency to petitioner for 2001 or 2002.

OPINION

I. General Principles

In general, married taxpayers may elect to file a joint Federal income tax return. Sec. 6013(a). After making the election, each spouse is jointly and severally liable for the entire Federal income tax liability for that year, whether as reported on the joint return or subsequently determined to be due. Sec. 6013(d)(3); see sec. 1.6013-4(b), Income Tax Regs. Subject to various conditions, an individual who has made a joint return with his or her spouse may seek relief from the joint and several liability arising from that joint return. There are three types of relief available under section 6015. In general, section 6015(b) provides full or apportioned relief from joint and several liability with respect to an understatement; section 6015(c) provides divorced or separated taxpayers proportionate tax relief with respect to a deficiency; and in certain circumstances section 6015(f) provides equitable relief if relief is not available under section 6015(b) or (c). Petitioner seeks relief under section 6015(b) or alternatively under section 6015(f).

II.  Relief Under Section 6015(b)

The assertion of a tax deficiency is a prerequisite to our granting relief under section 6015(b).  Block v. Commissioner, 120 T.C. 62, 65-66 (2003); Billings v. Commissioner, T.C. Memo. 2007-234; Rosenthal v. Commissioner, T.C. Memo. 2004-89; see sec. 6015(e)(1) (providing this Court jurisdiction to determine the appropriate relief available under section 6015(b) or (c) in the case of an individual "against whom a deficiency has been asserted").  Because respondent has asserted no deficiency for 2001 or 2002, petitioner does not qualify for relief under section 6015(b).[6]

III. Equitable Relief Under Section 6015(f)

A taxpayer who does not qualify for relief under section 6015(b) or (c) may nevertheless be relieved from joint and several liability if, taking into account all the facts and circumstances, it would be inequitable to hold the taxpayer liable for any unpaid tax or deficiency.  Sec. 6015(f)(1).  In determining the appropriate relief available under section 6015(f), we apply a de novo scope and standard of review.  Porter v. Commissioner, 132 T.C. 203 (2009).  Petitioner bears the

_____

[6]This circumstance also precludes relief under sec. 6015(c), which, in any event, petitioner has not sought.

burden of proving that he is entitled to equitable relief under section 6015(f).  See Rule 142(a).[7]

A.  Threshold Conditions

Rev. Proc. 2003-61, 2003-2 C.B. 296, prescribes guidelines that the Commissioner applies in determining whether an individual qualifies for relief under section 6015(f).[8]  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297, lists threshold conditions that must be satisfied before the Commissioner will consider a request for equitable relief under section 6015(f).[9]

---

[7]Petitioner does not contend that the burden of proof should shift to respondent pursuant to sec. 7491(a).

[8]Before our decision in Porter v. Commissioner, 132 T.C. 203 (2009), this Court looked to Rev. Proc. 2003-61, 2003-2 C.B. 296, or the revenue procedure which it superseded, Rev. Proc. 2000-15, 2000-1 C.B. 447, to decide whether the Commissioner had abused his discretion in denying relief under sec. 6015(f).  See, e.g., Wiener v. Commissioner, T.C. Memo. 2008-230 (applying Rev. Proc. 2000-15, supra); Beatty v. Commissioner, T.C. Memo. 2007-167 (applying Rev. Proc. 2003-61, supra).  Since Porter, this Court has continued to look to these revenue procedures as providing relevant factors for deciding de novo whether an individual is entitled to relief under sec. 6015(f).  See, e.g., Downs v. Commissioner, T.C. Memo. 2010-165 (applying Rev. Proc. 2003-61, supra); Wilson v. Commissioner, T.C. Memo. 2010-134 (applying Rev. Proc. 2000-15, supra).

[9]The seven threshold conditions are:  (1) The requesting spouse must have filed a joint return for the taxable years for which relief is sought; (2) the requested relief must not have been available to the requesting spouse under sec. 6015(b) or (c); (3) the requesting spouse applied for relief no later than 2 years after the date of the IRS' first collection activity; (4) no assets were transferred between the spouses as part of a fraudulent scheme by the spouses to hide income or avoid tax; (5) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse; (6) the requesting spouse did not file or
(continued...)

The parties agree that petitioner meets these threshold conditions.

B. "Safe Harbor" Conditions

If the threshold conditions are met, the Commissioner ordinarily will grant equitable relief under section 6015(f) with respect to an underpayment of income tax reported on a joint return if the following three "safe harbor" conditions are satisfied:  (1) On the date of the request for relief, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse (or has not been a member of the nonrequesting spouse's household at any time during the 12 months preceding the request for relief); (2) on the date the requesting spouse signed the joint return, the requesting spouse did not know or have reason to know that the nonrequesting

---

[9](...continued)
fail to file the return with fraudulent intent; and (7) and the income tax liability from which the requesting spouse seeks relief is attributable to an item of the individual with whom the requesting spouse filed the joint return.  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at 297.  In the revenue procedure that immediately preceded Rev. Proc. 2003-61, supra, the seventh condition listed above (income attribution) was treated not as a threshold condition but rather as a factor that might weigh for or against relief under the facts and circumstances test.  See Rev. Proc. 2000-15, sec. 4.03(1)(f), 2000-1 C.B. at 449.  This Court has followed that approach in applying Rev. Proc. 2000-15, supra, both under its pre-Porter abuse of discretion standard, see, e.g., Rosenthal v. Commissioner, T.C. Memo. 2004-89, and under its Porter de novo review standard, see, e.g., Wilson v. Commissioner, supra.  Because the parties agree that the income attribution factor is appropriately treated as a threshold condition and has been satisfied, we give no further consideration to this issue.

spouse would not pay the income tax liability; and (3) the requesting spouse will suffer economic hardship if relief is not granted. Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298. The parties agree that petitioner does not qualify for this "safe harbor" relief because, if for no other reason, he fails the first condition regarding marriage and household membership.

C. Facts and Circumstances Test

A requesting spouse such as petitioner, who satisfies the threshold conditions under Rev. Proc. 2003-61, sec. 4.01, but does not qualify for "safe harbor" relief under Rev. Proc. 2003-61, sec. 4.02, is nevertheless eligible for relief under section 6015(f) if, taking into account all facts and circumstances, it is inequitable to hold the requesting spouse liable for an underpayment on a joint return. Section 4.03, Rev. Proc. 2003-61, 2003-2 C.B. at 298-299, lists various factors to be considered in deciding whether to grant equitable relief under section 6015(f). No single factor is determinative, all factors are to be considered and weighed appropriately, and the listing of factors is not intended to be exhaustive. Id. Our analysis of the relevant facts and circumstances is set forth below.

1. Marital Status

Petitioner and Mrs. McGhee have been married at all relevant times. Although petitioner was frequently away from home because of business and military service, these temporary absences are

not considered separation for this purpose, since it could be reasonably expected that he would return (as he did) to the family household.  See id. sec. 4.03(2)(a)(i), 2003-2 C.B. at 298.  This factor is neutral.

### 2. Nonrequesting Spouse's Legal Obligation To Pay Pursuant to a Divorce Decree or Agreement

Because petitioner and Mrs. McGhee have not divorced, this factor is neutral.

### 3. Abuse

The parties agree that Mrs. McGhee never abused petitioner. This factor is neutral.

### 4. Health Problems

The parties agree that petitioner had no serious physical or mental health problems during 2001 or 2002 or at any other pertinent time.  This factor is neutral.

### 5. Compliance With Federal Tax Laws

Respondent concedes that petitioner's compliance with the income tax laws in years following the years at issue favors relief.

### 6. Economic Hardship

This factor favors relief if paying the tax debt would leave the requesting spouse unable to pay "reasonable basic living expenses."  Sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs. Respondent concedes that this factor favors relief.

### 7. Significant Benefit

This factor weighs against relief if the requesting spouse "received significant benefit (beyond normal support) from the unpaid income tax liability or item giving rise to the deficiency." Rev. Proc. 2003-61, sec. 4.03(2)(a)(v), 2003-2 C.B. at 299. "A significant benefit is any benefit in excess of normal support." Sec. 1.6015-2(d), Income Tax Regs. "Normal" support is to be measured by the parties' circumstances. Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989). Unusual or lavish support does not constitute "normal" support. Id. at 679; see Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228.

As petitioner and Mrs. McGhee reported on their amended joint tax returns, Mrs. McGhee embezzled over $240,000 ($126,772 in 2001 and $117,587 in 2002). Petitioner has offered no detailed explanation of what became of these funds. Mrs. McGhee testified vaguely that she spent the embezzled funds on food and clothing for herself and her children and for the children's soccer and cheerleading activities.[10] On the basis of this vague

_____

[10]We do not find this testimony entirely credible. It seems unlikely that in about a year Mrs. McGhee would have spent more than $240,000 of embezzled funds on food, clothing, and children's activities, especially in the light of petitioner's testimony that he also gave Mrs. McGhee funds from his separate bank accounts to pay for food, groceries, and soccer fees. There appears to be no dispute, however, that Mrs. McGhee spent the embezzled funds almost as quickly as she got them. In the

(continued...)

testimony, petitioner asserts with little elaboration that he did not benefit from the embezzled funds apart from "normal support". Petitioner has not expressly argued that he did not significantly benefit from the unpaid income tax liability.

Petitioner has introduced no evidence by which we might evaluate what might be considered "normal" support for him and has produced no specific evidence of lifestyle expenditures and asset acquisitions before, during, or after the years at issue.[11] Without such evidence, we are in no position to determine whether petitioner benefited from the embezzled funds or the unpaid tax liabilities in a manner that was beyond what might be considered his "normal" support. See Estate of Krock v. Commissioner, supra at 680-681. But even if we were to assume, for the sake of argument, that all the embezzled funds and amounts saved from taxes were used to cover family living expenses, it would appear that total living expenses thus covered would have exceeded by more than 100 percent what petitioner and Mrs. McGhee could have afforded on the basis of their combined wages. The subsidizing of such an enhanced lifestyle would constitute a benefit to

---

[10](...continued)
absence of evidence to the contrary, it seems likely that the embezzled funds were used to subsidize petitioner and Mrs. McGhee's general lifestyle.

[11]Given that petitioner was the primary breadwinner in his household (disregarding the embezzlements), it would appear that he normally would have supported Mrs. McGhee rather than the other way around.

petitioner exceeding normal support.  See <u>Jonson v. Commissioner</u>, 118 T.C. 106, 119-120 (2002) (finding that the taxpayer received a benefit exceeding normal support where tax savings helped cover family expenditures, including children's education), affd. 353 F.3d 1181 (10th Cir. 2003).  Petitioner has not carried his burden to prove that he enjoyed no significant benefit from the embezzled funds or the unpaid tax liabilities.  This factor weighs against relief.

> 8.  <u>Knowledge or Reason To Know</u>

This factor weighs against relief if the requesting spouse knew or had reason to know that the nonrequesting spouse would not pay the income tax liability.  Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(A), 2003-2 C.B. at 298.  It seems clear that when petitioner signed the amended joint returns, he knew or should have known that the additional taxes reported thereon would go unpaid.  According to respondent, that is all that matters.  He contends because the underpayments at issue arose from petitioner and Mrs. McGhee's amended joint returns, we should evaluate petitioner's knowledge as of the time he signed the amended joint returns rather than as of the time he signed the original joint returns.  Respondent also acknowledges, however, that this Court has held to the contrary.  See <u>Billings v. Commissioner</u>, T.C. Memo. 2007-234; <u>Rosenthal v. Commissioner</u>, T.C. Memo. 2004-89. In <u>Rosenthal</u>, this Court stated:

It is unpersuasive to argue, as does respondent, that petitioner's voluntary filing of an amended 1996 return and her attendant payment of the delinquent taxes attributable to the omission of income from the original 1996 return militate against equitable relief simply because she had to have known of the omission before she filed the amended return and made the payment. * * *

Furthermore, as this Court reasoned in Billings:

It would seem a trap for the unwary--and an inefficient requirement from the IRS's perspective--to require spouses to go through an audit whose outcome is preordained in a situation like that faced by the widow Rosenthal or Mr. Billings, rather than fess up by filing an amended return.

Respondent suggests that Rosenthal and Billings were decided incorrectly. We decline respondent's invitation to revisit the holdings in these cases, however, for we conclude that the knowledge factor is unfavorable to petitioner even as evaluated as of the time he signed the original returns.

More particularly, on August 15, 2003, when petitioner signed the original 2002 joint return, he had actual knowledge of Mrs. McGhee's embezzlements, which had been the subject of both a civil suit and criminal charges. On April 8, 2002, when petitioner signed the original 2001 joint return, he did not yet have actual knowledge of Mrs. McGhee's embezzlments, but he had reason to know, we believe, of items that "may be said to have reflected an understatement in tax". See Rosenthal v. Commissioner, supra.

In deciding whether a requesting spouse had reason to know of an understatement, "a key factor is the extent to which family expenditures, of which the spouse had knowledge, exceeded reported income." Barranco v. Commissioner, T.C. Memo. 2003-18, (citing Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979), and Hammond v. Commissioner, T.C. Memo. 1990-22, affd. without published opinion 938 F.2d 185 (8th Cir. 1991)). Other relevant considerations include: The requesting spouse's education level; any deceit or evasiveness of the nonrequesting spouse; the requesting spouse's degree of involvement in the activity generating the income tax liability; the requesting spouse's involvement in business and household financial matters; the requesting spouse's business or financial expertise; and any lavish or unusual expenditures compared with past spending levels. Barranco v. Commissioner, supra; Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(C), 2003-2 C.B. at 298.

The $126,772 that Mrs. McGhee embezzled in 2001 exceeded the $114,874 of total wages reported on the original 2001 joint return. According to Mrs. McGhee's testimony, she used these embezzled funds to cover family living expenses. As previously discussed, this would mean that family expenses covered in this manner exceeded petitioner and Mrs. McGhee's combined wages by more than 100 percent. Considering petitioner and Mrs. McGhee's financial circumstances during and shortly before 2001, it would

appear reasonable to conclude, in the absence of evidence to the contrary, that the level of expenditures occasioned by this influx of embezzled funds was unusual compared with past spending levels.[12] We are not persuaded that petitioner would have been unaware of this suddenly increased level of expenditures or of the discrepancy with reported income. After all, petitioner is highly educated, with a master's degree in business administration. He personally prepared the original joint tax returns. He was very involved in the family's finances. He testified that he "took care of the mortgage and the bills and insurance and utilities and stuff like that."

During 2001 Mrs. McGhee deposited the embezzled funds in a Bank of Oklahoma checking account that she held jointly with petitioner. Petitioner testified that he never saw any of the bank statements for this account until much later and that he did not even know it was a joint account or in which bank it was held. The evidence shows, however, that petitioner wrote several

---

[12]In 1998 or 1999 petitioner and Mrs. McGhee filed for bankruptcy. In 2001 petitioner and Mrs. McGhee offered to pay the IRS $42,000 to compromise over one-half million dollars of tax liability for tax years 1993 through 1998. According to information included in the administrative record, in accepting this offer the IRS determined that their combined annual wages for 2000 were $87,049, that their equity in all their assets (not counting the income stream from their wages) was about $13,000, and that their allowable monthly living expenses were $4,840 per month. The record contains no suggestion that petitioner and Mrs. McGhee, in seeking an offer-in-compromise, ever claimed living expenses exceeding their combined wages.

checks on this joint account during the years at issue. Moreover, we find petitioner's testimony difficult to square with the application for an offer-in-compromise that he and Mrs. McGhee submitted to the IRS in August 2001 and signed under penalties of perjury. This application required petitioner and Mrs. McGhee to submit Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, listing all bank accounts and balances. Although the record does not contain the Form 433-A submitted with their offer-in-compromise, the offer acceptance report of respondent's Appeals Office, which is in evidence, indicates that they had reported a Bank of Oklahoma checking account with a balance of $654. It seems apparent, then, that petitioner had knowledge of and access to the joint Bank of Oklahoma checking account before signing the original 2001 joint income tax return on April 8, 2002.

Petitioner claims that Burch & George initially indicated that it intended to treat the embezzled funds as a loan and that they expected repayment. He claims that he was advised that the embezzlement proceeds would not constitute taxable income. On cross-examination, however, he conceded that Mrs. McGhee's criminal lawyer had advised him that it was doubtful that the embezzled funds would be treated as a loan for tax purposes unless petitioner or Mrs. McGhee made a lump-sum repayment.[13]

---

[13]Petitioner testified that he could not remember whether he
(continued...)

Petitioner also conceded that at the time he was unable to make any lump-sum repayment.  Furthermore, any confusion about the manner in which Burch & George might have regarded the embezzlement proceeds should have been clarified no later than June 18, 2002, when Burch & George filed a civil suit against petitioner and Mrs. McGhee seeking recovery of the embezzled funds plus damages and costs.

In any event, because we have concluded that petitioner knew or should have known of the income from the embezzlements, it is irrelevant whether he knew it was taxable.  See Mitchell v. Commissioner, 292 F.3d 800, 803-806 (D.C. Cir. 2002), affg. T.C. Memo. 2000-332; Cheshire v. Commissioner, 282 F.3d 326, 333-335 (5th Cir. 2002), affg. 115 T.C. 183 (2000); Price v. Commissioner, T.C. Memo. 1987-360.

D.  Conclusion About Equitable Relief

As indicated by the foregoing analysis, four factors are neutral.  Two of the factors--compliance with Federal tax laws and economic hardship--favor relief.  Two of the factors-- significant benefit and knowledge--weigh against relief.  Thus, as respondent acknowledges, a "strictly mathematical balancing of the factors shows them to be in equipoise".  If we were to conclude on this score that there is an evidentiary tie, then

---

[13](...continued)
discussed this matter with a tax lawyer.  We find it difficult to believe that petitioner would have relied on a criminal lawyer for this important tax advice without consulting a tax lawyer.

petitioner would lose for failure to carry his burden of proof. But rather than decide this case on that basis, we conclude on a preponderance of all the evidence that petitioner is not entitled to equitable relief.  In reaching this conclusion, we take into account petitioner's lack of credibility on several key points as well as his seeming lack of good faith in waiting until after the IRS had opened an audit on his 2002 tax year to file amended joint returns reflecting the embezzlement proceeds that he had, at that point, long known about but had not previously reported.

IV.  Conclusion

Petitioner is not entitled to relief under section 6015(b) or (f).  To reflect the foregoing,

Decision will be entered

for respondent.